**TELEVENTURES, INC., Appellant,**

v.

**INTERNATIONAL GAME TECHNOLOGY and IGT, Appellees.**

**No. 03–99–00116–CV.**

Court of Appeals of Texas, Austin.

Feb. 25, 2000.

Rehearing Overruled March 30, 2000.

Jerry Galow, Watson, Bishop, London & Galow, P.C., Austin, for appellant.

John L. Foster, Minton, Burton, Foster & Collins, P.C., Austin, for appellee.

Before Chief Justice ABOUSSIE, Justices B.A. SMITH and YEAKEL.

LEE YEAKEL, Justice.

This is an appeal arising from the district court's sustaining appellees' special appearance.[1] The sole issue on appeal is whether Texas courts can assert *in personam* jurisdiction over a Nevada corporation in a suit concerning termination of its relationship with a Texas corporation. Appellees International Game Technology and IGT specially appeared challenging

---

1. In its brief, TeleVentures states that it is appealing pursuant to Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7) (West Supp.2000) (appeal may be brought from interlocutory order granting or denying special appearance). However, the district court's "Order" dismisses the entire case: "IT IS ... OR-

DERED by the Court that [appellees'] special appearance motion is hereby sustained, and that this cause is dismissed for want of jurisdiction with prejudice for refiling same in Texas." We will address the appeal as one from a final order of the district court.

the district court's personal jurisdiction. The district court sustained their special appearance and dismissed appellant Tele-Ventures, Inc.'s suit for want of jurisdiction. We will affirm.

## BACKGROUND

In early 1995, Chris Tyson, the president and principal owner of TeleVentures, Inc. ("TeleVentures"), contacted IGT, a manufacturer of slot machines, to discuss his concept for "in-room gaming." [2] Tyson's first contact with IGT was by telephone from Tyson's office in Texas to IGT's office in Reno, Nevada. Tyson followed his call with a personal visit to IGT's Reno office. IGT is a Nevada corporation with its principal place of business in Nevada. It neither does business nor is authorized to do business in Texas. It has no agents, offices, or property in Texas and is not a party to any contract requiring acts to be performed in Texas. IGT has not directly hired any employees in Texas nor has it asked others such as TeleVentures to hire employees in Texas. The same is true of IGT's parent corporation, International Game Technology.[3] Ultimately, TeleVentures and IGT signed two letters of intent. At the time the letters of intent were signed, TeleVentures was a Texas corporation with its principal place of business in Austin.[4]

After IGT expressed an initial interest in the in-room gaming concept, other meetings followed, always in Nevada. IGT and TeleVentures concluded that there were two ways to connect hotel televisions to IGT's gaming technology. Tyson had previously developed one of these alternatives with the assistance of U.S. West Marketing Resources Group Inc. ("U.S.West"), a Colorado corporation. The process consisted of attaching an IGT game board to a U.S. West switch, which would in turn be attached to an On Command Video ("OCV") switch.[5] The second concept, developed by IGT during its relationship with TeleVentures, involved directly attaching an IGT game board to an OCV switch, thus eliminating the need for the intermediate use of the U.S. West switch.

U.S. West demonstrated its technology to IGT and TeleVentures at its offices in Colorado in September 1995. While in Colorado, IGT and TeleVentures signed the first of two letters of intent. The letter provided that IGT and TeleVentures would develop an in-room gaming system; the two would "work together using their best efforts to develop and install the System by combining the existing and future technology and equipment of TeleVentures with the existing and future technology of IGT"; they would "mutually agree upon a hotel property designated as a test location in which to install and evaluate the performance of the system"; the test would be conducted and the results evaluated; and if both agreed that those results were satisfactory, they would enter into a formal agreement to develop, market, or install the system on a commercial basis. Following the September letter, IGT and TeleVentures signed the second letter of intent "wherein a mutually beneficial business relationship is contemplated between Hospitality Network, Ltd., a Texas limited

---

2. For purposes of this case, "in-room gaming" is a concept where a hotel guest would be able to gamble and play games such as blackjack, slots, or poker on the television set in the guest's hotel room.

3. This suit arises from IGT's dealings with TeleVentures. International Game Technology was sued on *alter ego* theories based on its relationship with IGT. Their interests do not diverge. We will refer to appellees jointly as "IGT."

4. During the events preceding this suit, TeleVentures merged with a Nevada corporation of the same name. TeleVentures thus became a Nevada corporation but maintained its principal place of business in Austin, Texas.

5. On Command Video is a California corporation that IGT testified could bring "secure and undistorted data from IGT's devices to hotel rooms."

partnership,[6] and a newly formed partnership [to be called Game Ventures] consisting of IGT, a Nevada corporation ('IGT') and TeleVentures, Inc., a Texas corporation." This letter was prepared by TeleVentures in its Austin office and mailed to Nevada, where it was signed by IGT.

After considering the two alternatives for linking IGT's devices to hotel room television sets, IGT decided, for reasons of cost, convenience, and security, that the direct-attachment system was the better choice. IGT made this decision after the first few meetings with TeleVentures but continued to work with TeleVentures because TeleVentures had "the concept" of in-room gaming, "an understanding of in-room television," and a personal connection with Hospitality Network, which had a "good understanding of in-room television in the hotel business."

Although IGT had anticipated that some of the technology and equipment for the concept would be provided by TeleVentures, IGT's decision not to use the U.S. West system resulted in IGT's dealing directly with OCV because for reasons not indicated in the record, OCV refused to work with TeleVentures. Additionally, IGT did not share any information regarding its gaming technology with TeleVentures. As a result, TeleVentures did not contribute further to the development of the direct-attachment system. However, TeleVentures, on its own initiative, began to explore a third alternative, the "game cube," that could be used in hotels not wired with the OCV system. IGT was aware of TeleVentures' work but never incorporated the game cube into its development plans.

During their relationship, IGT and TeleVentures communicated via personal visits, facsimiles, letters, and telephone calls. TeleVentures' employees traveled to Nevada; however, no IGT employees or representatives came to Texas. The record reflects at least seventy written communications to and from Texas consisting of de-

velopment updates, travel arrangements, meeting schedules, and even a Christmas card. Decisions regarding how the project was to move forward were made during the calls, visits, and written communications. TeleVentures prepared and forwarded a proposed draft of a partnership and operating agreement to IGT in Nevada, but IGT never signed them.

TeleVentures established offices and a payroll in Austin, Texas, and created several marketing devices: (1) a study of potential test sites and marketplaces for the system; (2) an updated business plan introducing the name "CasinoVision"; (3) brochures, a logo, and other marketing material to promote "CasinoVision"; and (4) at IGT's request, a "Business Summary." TeleVentures asked IGT for a videotape that TeleVentures could implant onto a CD ROM, which could be used to demonstrate "hotel in-room gaming using a remote control like in a hotel room." All TeleVentures' activities were performed in Texas.

In March 1996, IGT connected one of its gaming boards to an OCV switch and conducted a mini-demonstration in Nevada. IGT and TeleVentures also planned to travel to Aruba to conduct a hotel test of the in-room gaming system. The trip never occurred, and in June 1996, IGT announced its decision to discontinue pursuing the idea of in-room gaming with TeleVentures. The parties attempted to rework their arrangement, but the effort was abandoned on January 9, 1997 when IGT sent a final letter unilaterally terminating any relations with TeleVentures (the "termination letter").

TeleVentures filed this suit against IGT accusing IGT of breach of contract, breach of fiduciary duties, fraud in the inducement of the letters of intent, fraudulent concealment, negligent misrepresentation, and tortious interference. IGT specially appeared challenging the district court's personal jurisdiction. *See* Tex.R. Civ. P.

---

**6.** Hospitality Network, Ltd. is a provider of interactive hotel television services.

120a. The district court sustained IGT's challenge. TeleVentures appeals.

## DISCUSSION

In its sole issue on appeal, TeleVentures claims that the district court erred in sustaining IGT's special appearance and dismissing the suit for lack of *in personam* jurisdiction because: (1) IGT purposefully directed activities into Texas; (2) this lawsuit arises from and relates directly to such activities and torts committed in this state; and (3) the district court's exercise of jurisdiction over IGT does not offend traditional notions of fair play and substantial justice. TeleVentures argues that IGT entered into a contract with a Texas corporation knowing that the majority of TeleVentures' work was to be done in Texas, and through IGT's constant contact with TeleVentures by phone calls, letters, facsimiles, and personal visits, IGT was aware of and approved the work done in Texas. TeleVentures also argues that IGT, through TeleVentures, recruited Texas residents located in Texas for performance of their joint objectives. TeleVentures further asserts that its causes of action, which include breach of contract, breach of fiduciary duties, fraud in the inducement, fraudulent concealment, negligent misrepresentation, and tortious interference arise from and are related to IGT's contacts with Texas because: (1) the breach of contract and breach of fiduciary duties involve a contract that was to be partially performed in Texas; (2) the breach of contract, breach of fiduciary duties, fraud in the inducement, fraudulent concealment, negligent misrepresentation, and tortious interference occurred in Texas when IGT sent the termination letter to TeleVentures in Texas; and (3) the causes of action for fraud in the inducement, negligent misrepresentation, and tortious interference are based, in part, upon statements IGT made in communications to TeleVentures in Texas with the intent of inducing TeleVentures to enter into the two letters of intent. Finally, TeleVentures asserts that the assumption of jurisdiction in Texas does not offend notions of fair play and substantial justice because IGT is a multi-million dollar conglomerate that does business throughout the world. Thus, litigation in Texas would not be excessively burdensome to IGT, in contrast to the burden that litigation in Nevada would impose on TeleVentures, a start-up company with little or no revenue.

### *Burden of Proof and Standard of Review*

■ In interposing a special appearance, the nonresident defendant challenging personal jurisdiction bears the burden of proof to negate all bases of personal jurisdiction alleged by the plaintiff. *See Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 231 n. 13 (Tex.1991) (citing *Zac Smith & Co. v. Otis Elevator Co.*, 734 S.W.2d 662, 664 (Tex.1987); *Siskind v. Villa Found. for Educ., Inc.* 642 S.W.2d 434, 438 (Tex. 1982)); *Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 203 (Tex.1985).

■ The district court filed findings of fact and a conclusion of law.[7] *See* Tex.R.

---

7. The district court made five "findings of fact":

1. Neither IGT nor International Game Technology have maintained continuous or systematic contacts with the State of Texas;
2. The liability of IGT and International Game Technology alleged by [TeleVentures] does not arise from, nor is it related to, activity by those companies conducted in Texas;
3. The injuries alleged in [TeleVentures'] pleadings do no[t] arise from, nor are they related to, activities of IGT or International Game Technology purposefully directed to the State of Texas;
4. The contact[s] of IGT and International Game Technology with the State of Texas were minimal and fortuitous and not a result of their purposefully conducted activities with the State of Texas; and
5. The exercise of personal jurisdiction over IGT [and] International Game Technology in the State of Texas would not comport with traditional notions of fair play and substantial justice;

and one "conclusion of law":

Civ. P. 296–297. TeleVentures asserts that the "findings of fact are not findings at all, but rather, legal conclusions." The parties do not dispute the material facts before the district court in any significant degree. We agree with TeleVentures that the district court's "findings" and "conclusion" are, in actuality, all conclusions of law and we will consider them as such. We review the trial court's conclusions of law *de novo. See Piazza v. City of Granger,* 909 S.W.2d 529, 532 (Tex.App.—Austin 1995, no writ). Conclusions of law will not be reversed unless they are erroneous as a matter of law. *See id.* (citing *Westech Eng'g, Inc. v. Clearwater Constructors, Inc.,* 835 S.W.2d 190, 196 (Tex.App.—Austin 1992, no writ)).

### *Jurisdiction*

■ A Texas court may exercise personal jurisdiction over a nonresident defendant if: (1) jurisdiction is authorized by the Texas long-arm statute,[8] and (2) the exercise of jurisdiction is consistent with federal and state due process standards. *See Guardian Royal,* 815 S.W.2d at 226; *Transportacion Especial Autorizada, S.A. v. Seguros Comercial America, S.A.,* 978 S.W.2d 716, 719 (Tex.App.—Austin 1998, no pet.). The long-arm statute allows Texas courts jurisdiction to the full extent permitted by the United States Constitution. *See Guardian Royal,* 815 S.W.2d at 226. Thus, the only limitations on Texas courts in asserting personal jurisdiction over a nonresident defendant are those imposed by the Due Process Clause of the Fourteenth Amendment. *See Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 413–14, 104 S.Ct. 1868, 80 L.Ed.2d 404

(1984). Due process requires a showing that the nonresident defendant has purposefully established "minimum contacts" with Texas and that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *See International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *Guardian Royal,* 815 S.W.2d at 230–31.

■ Although the jurisdiction of Texas courts is always dependent on the defendant's having some minimum contacts with Texas, the requisite extent of those contacts varies depending on the type of *in personam* jurisdiction sought to be imposed. Thus, the United States Supreme Court has refined the minimum-contacts analysis into specific and general jurisdiction. *See Guardian Royal,* 815 S.W.2d at 227 (citing *Helicopteros,* 466 U.S. at 414–16, 104 S.Ct. 1868).

■ To establish specific jurisdiction, the cause of action must arise out of or relate to the nonresident defendant's contact with the forum state and the conduct must have resulted from that defendant's purposeful conduct, not the unilateral conduct of the plaintiff or others. *See id.* (citing *Helicopteros,* 466 U.S. at 414 n. 8, 417, 104 S.Ct. 1868; *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 293–94, 298, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). "Furthermore, the nonresident defendant's activities must have been 'purposefully directed' to the forum and the litigation must result from alleged injuries that 'arise out of or relate to' those activities." *Id.* at 228, 100 S.Ct. 559 (citing *Burger King Corp. v. Rudzewicz,* 471 U.S.

---

The courts of the State of Texas may not, consistent with the Constitution of the United States, exercise personal jurisdiction over IGT and International Game Technology.

**8.** *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 17.041–.045 (West 1997). The long-arm statute provides a non-exclusive enumeration of acts by a nonresident that constitute doing business in Texas: "(1) contract[ing] by mail or otherwise with a Texas resident and either

party is to perform the contract in whole or in part in [Texas]; (2) commit[ting] a tort in whole or in part in [Texas]; or (3) recruit[ing] Texas residents, directly or through an intermediary located in [Texas], for employment inside or outside of [Texas]." *Id.* § 17.042; *see also Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991); *Schlobohm v. Schapiro,* 784 S.W.2d 355, 357 (Tex.1990).

462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Zac Smith & Co.*, 734 S.W.2d at 663). Thus, in analyzing minimum contacts for purposes of Texas courts' specific jurisdiction, we focus on the relationship among the nonresident defendant, the forum, and the litigation. *See id.* (citing *Helicopteros*, 466 U.S. at 414, 104 S.Ct. 1868; *Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex.1990)).

■■■■ An assertion of general jurisdiction compels a more demanding minimum-contacts analysis and requires a showing of substantial activities within the forum state. *See id.* (citing *Schlobohm*, 784 S.W.2d at 357). The cause of action need not arise from or relate to the nonresident defendant's purposeful conduct within the forum state, but there must be "continuous and systematic contacts" between the nonresident defendant and the forum state. *See id.* (citing *Helicopteros*, 466 U.S. at 414–16, 104 S.Ct. 1868; *Schlobohm*, 784 S.W.2d at 357). In the present case, the parties agree that the district court does not have general jurisdiction over IGT; therefore, we will address only specific jurisdiction.

■■■■ To ensure compliance with the federal constitutional requirements of due process, the Texas Supreme Court has developed what it terms a "formula" for determining jurisdiction. *See generally Guardian Royal*, 815 S.W.2d at 229–31.[9] Initially, the nonresident defendant must have purposefully established minimum contacts with Texas, and when, as here, specific jurisdiction is asserted, the cause of action must arise out of or relate to these contacts. *See id.* at 230. Also, the action or conduct of the nonresident defendant purposefully directed toward Texas must give rise to a "substantial connection between" Texas and the nonresident. *See*

*id.* Second, the assumption of jurisdiction by Texas must comport with fair play and substantial justice. *See id.* at 230–31 (citing *Burger King*, 471 U.S. at 477, 105 S.Ct. 2174; *Zac Smith & Co.*, 734 S.W.2d at 664).

### Minimum Contacts

■■■■ We must first decide whether TeleVentures' causes of action arise out of or relate to IGT's contacts with Texas. The nonresident defendant must have purposely availed itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protection of its laws. *See Burger King*, 471 U.S. at 474–75, 105 S.Ct. 2174. The purposeful-availment requirement ensures that a nonresident defendant will not be haled into a foreign jurisdiction based solely on random, fortuitous, or attenuated contacts or unilateral activity of another party or a third person. *See id.* at 475, 105 S.Ct. 2174. A nonresident defendant must have fair warning that a particular activity may subject it to the jurisdiction of a foreign sovereign. *See id.* at 472, 105 S.Ct. 2174. Isolated contacts with the forum state or its residents are not sufficient for a court to assume personal jurisdiction over a nonresident defendant. *See id.* at 475, 105 S.Ct. 2174. In assessing IGT's contacts with Texas, we will look first to the letters of intent.

### Letters of Intent

■■■■ TeleVentures argues that personal jurisdiction is established because its suit concerns agreements (the letters of intent) made between TeleVentures, a Texas corporation, and IGT that were to be partially performed in Texas. However, merely contracting with a Texas corporation does not satisfy the minimum-contacts requirement. *See Burger King*, 471

9. This formula was first expressed by the supreme court in *O'Brien v. Lanpar Co.*, 399 S.W.2d 340 (Tex.1966), when the court adopted the Washington Supreme Court's articulation in *Tyee Construction Co. v. Dulien Steel Products, Inc.*, 62 Wash.2d 106, 381 P.2d 245 (1963). The formula has been reviewed and modified as the United States Supreme Court has examined, developed, and refined the permissible reach of federal due process. *See Guardian Royal*, 815 S.W.2d at 230; *Schlobohm*, 784 S.W.2d at 358.

U.S. at 478, 105 S.Ct. 2174; *Magnolia Gas Co. v. Knight Equip. & Mfg. Corp.*, 994 S.W.2d 684, 691 (Tex.App.—San Antonio 1998, no pet.). Instead, courts must apply a "highly realistic" approach that recognizes that a "contract ... [is] ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." *Burger King*, 471 U.S. at 478, 105 S.Ct. 2174. Prior negotiations, contemplated future consequences, the terms of the contract, and the parties' actual course of dealing must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum. *See id.* at 478–79, 105 S.Ct. 2174. Likewise, partial performance of a contract in Texas is "not the *sine qua non* of personal jurisdiction." *Magnolia Gas Co.*, 994 S.W.2d at 692; *see also U–Anchor Advertising, Inc. v. Burt*, 553 S.W.2d 760, 763 (Tex.1977) (finding no personal jurisdiction even though plaintiff's cause of action was connected with contractual obligations that were partially performable in Texas).

The crux of both letters of intent is the agreement by TeleVentures and IGT to develop an "in-room gaming system." The first letter refers only to TeleVentures and IGT. The second letter refers to "a newly formed partnership" between TeleVentures and IGT that "shall be called 'Game Ventures'" and will establish a "beneficial business relationship" with Hospitality Network. The system to be developed by TeleVentures and IGT, as Game Ventures, is the same as referenced in the earlier letter. Neither letter indicates a place of performance nor gives any guidance with regard to the state in which either TeleVentures or IGT will perform any obligation arising from the letters. The second letter does not disclose the state in which the new Game Ventures partnership is to be formed or domiciled. IGT acknowledges that it anticipated TeleVentures would contribute to the technological development of the system. However, once the decision was made to use the direct attachment system, TeleVentures did not participate in the further development of that system for two reasons: (1) OCV would not participate if TeleVentures was present at any discussions between itself and IGT; and (2) IGT did not give TeleVentures its gaming board information, which was necessary to develop the in-room gaming system. As a result, TeleVentures' contributions were limited to its unilateral decisions to develop the game cube and various marketing tools.

Although IGT had knowledge of the game cube, IGT neither required nor requested it. IGT had decided to use the direct-attachment system. In addition, IGT did not use the game cube. The focus of the analysis must be on the actions of IGT, not TeleVentures, and the contacts that give rise to jurisdiction must come from IGT's purposeful conduct, not the one-sided activity of TeleVentures. *See Helicopteros*, 466 U.S. at 417, 104 S.Ct. 1868; *World–Wide Volkswagen*, 444 U.S. at 292, 100 S.Ct. 559. TeleVentures' independent action in developing the game cube is not sufficient to confer jurisdiction over IGT. *See Barnstone v. Congregation Am. Echad*, 574 F.2d 286, 288–89 (5th Cir.1978) (dismissing case for lack of jurisdiction because contract with Texas architect to design and oversee construction of synagogue was wholly performable in Maine, negotiations took place through mail, and only connection with Texas was unilateral activity of architect in preparing sketches for building at architect's office in Texas). For the most part, TeleVentures' act of developing various marketing tools was also unilateral. While a "Business Summary" was prepared at IGT's request, such request does not establish jurisdiction. According to Tyson, the business summary was designed to serve as a marketing tool and to solicit and attract interest from third-party investors. The letters of intent each contemplate that a subsequent agreement regarding marketing would be prepared *after* successful testing of the in-room gaming system. The prep-

aration of the business summary was no more than a part of the ongoing communications between TeleVentures and IGT and was not required by either letter agreement. *See Magnolia Gas Co.,* 994 S.W.2d at 692 (no minimum contacts where defendant "neither required nor bargained for" work to be done in Texas). Simply asking TeleVentures to produce a business summary does not establish a "substantial connection" between IGT and Texas. *See Guardian Royal,* 815 S.W.2d at 230 (requiring substantial connection between non-resident and forum state).

The unexecuted proposed formal partnership agreement prepared by TeleVentures provided for performance in Nevada. TeleVentures changed its state of incorporation from Texas to Nevada during its relationship with IGT. The terms of the letters of intent and the history of the parties' negotiations do not reveal purposeful conduct by IGT sufficient to subject it to the jurisdiction of the Texas district court.

*Numerous Contacts & Recruiting Texas Employees*

 TeleVentures argues that the numerous and repeated contacts between it and IGT by telephone, mail, and facsimile establish the requisite minimum contacts by IGT. In a minimum-contacts analysis, it is not the number, but rather the quality and nature of the nonresident's contacts with Texas that are important. *See Guardian Royal,* 815 S.W.2d at 230 n. 11 (citing *Texas Commerce Bank v. Interpol '80 Ltd.,* 703 S.W.2d 765, 772 (Tex. App.—Corpus Christi 1985, no writ)); *Memorial Hosp. Sys. v. Fisher Ins.,* 835 S.W.2d 645, 650 (Tex.App.—Houston [14th Dist.] 1992, no writ). After reviewing the communications between the parties contained in the record, we conclude that they are not sufficiently related to the cause of action. They consist for the most part of development updates and travel arrange-ments. While IGT admits that decisions regarding the project were made while in communication with TeleVentures, these contacts are insufficient to establish *in personam* jurisdiction. Minimum contacts may not be satisfied by merely engaging in communications with a Texas corporation during performance of a contract. *See Magnolia Gas Co.,* 994 S.W.2d at 691 (citing *Gundle Lining Constr. Corp. v. Adams County Asphalt, Inc.,* 85 F.3d 201, 205–08 (5th Cir.1996)). The exchange of communications between TeleVentures and IGT in the course of developing and carrying out the contract is in itself insufficient to constitute purposeful availment of the benefits and protections of Texas law. *See Holt Oil & Gas Corp. v. Harvey,* 801 F.2d 773, 778 (5th Cir.1986) (citing *Patterson v. Dietze, Inc.,* 764 F.2d 1145, 1147 (5th Cir. 1985)) (numerous telephone calls from defendant to forum during course of performance insufficient to support specific jurisdiction).

TeleVentures also posits that Texas has jurisdiction over IGT because the termination letter, which it argues breached the agreement created by the letters of intent, was sent into Texas from without the state. TeleVentures cites no authority for this proposition. The breach, if any, was not created by the termination letter; rather, if there was a breach, it occurred when and where IGT ceased its performance of the contract. *See Methodist Hosps. v. Corporate Communicators, Inc.,* 806 S.W.2d 879, 882 (Tex.App.—Dallas 1991, writ denied) (breach of contract occurs when party fails or refuses to perform); *see also* Restatement (Second) of Contracts § 235(2) (when performance is due, any non-performance is breach). The termination letter gives TeleVentures notice that IGT will no longer pursue the concept of in-room gaming and will proceed no further with TeleVentures. Considering that (1) contracting with a Texas resident is not enough to confer jurisdiction;[10] and (2) communications between

---

**10.** *See, e.g., Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 478, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

the resident and non-resident during performance of a contract will not confer jurisdiction,[11] we hold that the mailing of a notice that IGT will no longer pursue in-room gaming is likewise not sufficient to establish jurisdiction.

■ TeleVentures' argument that IGT recruited Texas residents for employment is not substantiated by the record. The fact that *TeleVentures* hired employees to help it develop the in-room gaming concept does not satisfy the long-arm statute condition that *IGT* recruit Texas residents through an intermediary located in Texas. *See* Tex. Civ. Prac. & Rem.Code § 17.042.

### Tortious Acts

TeleVentures argues that IGT's alleged fraudulent and negligent misrepresentations made by way of phone calls, letters, and facsimiles constitute tortious acts committed by IGT in Texas. TeleVentures directs us to the decisions of several state and federal courts to support its position. We do not find these cases persuasive. In each, the communication itself was the specific conduct that constituted the tortious act. In *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), the *National Enquirer* published an allegedly libelous story concerning the California activities of a California resident. *See* 465 U.S. at 784–85, 104 S.Ct. 1482. The defendants were Florida residents, one a reporter for and the other the president of the *Enquirer. See id.* at 785–86, 104 S.Ct. 1482. Most of the research and writing of the article was done in Florida. *See id.* at 785, 104 S.Ct. 1482. The *Calder* court held that the defendants, who between them wrote and edited the article, could anticipate being haled into a California court when the article was published, as California was the state in which the subject of the article resided and where the *Enquirer* had its largest circulation. *See id.* at 789–90, 104 S.Ct. 1482. The article itself was

the basis of the injury and the cause of action.

*McGee v. International Life Insurance Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), involved the mailing of a reinsurance certificate to a California resident, Franklin, by a Texas insurance company. *See* 355 U.S. at 221, 78 S.Ct. 199. The certificate was an offer by the Texas company to insure Franklin in accordance with an insurance contract Franklin held with an Arizona insurance company whose insurance obligations had been assumed by the Texas company. *See id.* Franklin accepted the offer and from then until his death mailed premiums from California to Texas. *See id.* at 221–22, 78 S.Ct. 199. California jurisdiction was proper because the contract itself had a substantial connection with that state and California had "a manifest interest in providing effective means of redress for its residents when their insurers refuse to pay claims." *Id.* at 223, 78 S.Ct. 199. That "manifest interest" is largely a creature of regulatory law and is not applicable to the facts before us.[12]

*Rowland & Rowland v. Texas Employers Indemnity Co.,* 973 S.W.2d 432 (Tex. App.—Austin 1998, no pet.), centered on a single letter written by the nonresident defendant, a Tennessee law firm, to the plaintiff, a Texas indemnity company. *See* 973 S.W.2d at 434. The Texas company, relying on representations in the letter that the Tennessee firm would protect its interest in a wrongful death suit pending in Tennessee, did not intervene in the Tennessee litigation. *See id.* At the conclusion of the suit, the law firm distributed the entire recovery to the wrongful death claimants to the exclusion of the Texas company, which then sued the Tennessee firm in Texas for negligent misrepresentation. *See id.* Texas jurisdiction was upheld on two bases: the letter itself

---

**11.** *See, e.g., Magnolia Gas Co.,* 994 S.W.2d at 691.

**12.** The Texas Supreme Court has specifically discussed *McGee* in such a context. *See Guardian Royal,* 815 S.W.2d at 229 n. 8.

constituted a purposeful contact directed to Texas with the intent that its representations be relied upon, and the Tennessee law firm unilaterally decided to distribute all of the proceeds to the wrongful death claimants and their lawyers, all of whom were residents of Texas. *See id.* at 435–36.

In *Memorial Hospital System v. Fisher Insurance Agency, Inc.,* 835 S.W.2d 645 (Tex.App.—Houston [14th Dist.] 1992, no writ), the plaintiff hospital telephoned the defendant, a Mississippi insurance agency, to verify workers' compensation insurance coverage prior to admitting an injured worker. *See* 835 S.W.2d at 648. Relying on the Mississippi agency's affirmative response, the hospital admitted and treated the worker. *See id.* When it discovered that there was in fact no coverage, the hospital brought suit in Texas against the Mississippi agency. *See id.* The court of appeals affirmed jurisdiction in Texas because the specific representation in the call was relied upon in Texas. *See id.* Both *Rowland & Rowland* and *Memorial Hospital System* demonstrate allegedly tortious conduct in a specific communication intended to be relied upon within the state of Texas. While TeleVentures directs us to a quantity of communications between it and IGT, it fails to point to any specific representation that constitutes an allegedly tortious act, as distinguished from general, ongoing communications during the performance of a contract. *See Guardian Royal,* 815 S.W.2d at 230 n. 11 (quality, not quantity, determines sufficiency of nonresident's contacts with Texas); *Magnolia Gas Co.,* 994 S.W.2d at 691 (minimum contacts not satisfied by merely engaging in communications during performance of contract).

Finally, in *Brown v. Flowers Industries, Inc.,* 688 F.2d 328 (5th Cir.1982), Brown alleged that he lost the chance to obtain a loan because of a defamatory statement made in a telephone call made by Karlis, an Indiana resident, from his office in Indiana to the United States Attorney in Mississippi. *See* 688 F.2d at 330–31. The Mississippi court had jurisdiction over Karlis because, in the specific call initiated by Karlis, he allegedly committed an intentional tort, the injurious effect of which was felt in Mississippi and was foreseeable at the time of the call. *See id.* at 334.

 In the record before us, we find no communication by IGT directed to and intended to be relied upon by TeleVentures in Texas that, if false, gives rise to any cause of action alleged by TeleVentures.

## CONCLUSION

We hold that IGT did not conduct purposeful activities in Texas in its dealings with TeleVentures. The record reveals much activity in Texas by TeleVentures but no activity of substance by IGT. IGT's Texas contacts were incidental and immaterial to the purpose of the contract, the development of an in-room gaming system, and were not instigated by IGT. We overrule TeleVentures' issue.[13]

We hold that the district court properly found it could not exercise *in personam* jurisdiction over IGT and affirm the district court's order sustaining IGT's special appearance and dismissing TeleVentures' suit for lack of personal jurisdiction.

---

**13.** Because we hold that IGT did not have the requisite minimum contacts with Texas to be subject to the jurisdiction of the district court, we need not address the second inquiry of the jurisdictional formula—whether the assertion of personal jurisdiction would comport with fair play and substantial justice. *See Guardian Royal,* 815 S.W.2d at 231.