**Reversed and Rendered and Opinion Filed February 17, 2017**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-16-00691-CV

### THE UNIVERSITY OF ALABAMA, Appellant
### V.
### THE SUDER FOUNDATION, Appellee

**On Appeal from the 191st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-15-08295**

## MEMORANDUM OPINION
Before Justices Lang, Brown, and Whitehill
Opinion by Justice Whitehill

This is a special appearance interlocutory appeal arising from a contractual arrangement between a Texas private foundation and a foreign state public university. The pivotal question is whether the university's communications with Texas residents and attendance at various meetings in Texas due to that contractual relationship support specific jurisdiction over the university in this case based on that contractual arrangement.

In two issues, the University of Alabama (UA) urges that the trial court erred in denying its special appearance in this suit filed by the Suder Foundation (the Foundation) because (i) UA did not commit any acts that constitute purposeful availment in this state and the Foundation's claims do not arise from or relate to any activities conducted here and, regardless, exercising personal jurisdiction over it in this case would offend traditional notions of fair play and

substantial justice and (ii) there is legally or factually insufficient evidence supporting the trial court's order.

For the reasons discussed below, we conclude that (i) UA's contacts with Texas do not constitute the required minimum contacts and (ii) we thus need not consider whether exercising personal jurisdiction would offend traditional notions of fair play and substantial justice. Nor do we reach UA's second issue. Accordingly, we reverse the trial court's order denying UA's special appearance and render judgment dismissing the Foundation's claims against UA for lack of personal jurisdiction.

## I. Background

### A. The Parties

UA is a public educational institution located in Alabama.

The Foundation, a private Texas non-profit organization, runs the First Scholars Program (the Program). The Program "is administered on the campuses of select four-year major public universities," and provides "start-up and early-stage funding," scholarship support, and resources to affiliate universities for use on participating campuses across the United States. The Program is intended to support the success of first generation college students at participating universities.

### B. The Contractual Relationship Giving Rise to the Lawsuit

In 2009, UA employee Kim Gentry called Dianne Schorr, the Foundation's executive director, to learn more about the Program. The discussion included UA's involvement with another first generation student program and UA's plans for future funding. Gentry said UA was "really open" about future funding opportunities.

In January 2010, Gentry sent the Foundation a letter expressing an interest in future first generation college student opportunities with the Foundation.

A month later, the Foundation published a request for proposals in various national educational periodicals seeking applications for participation in the Program. Schorr also mailed the RFP to about sixty universities, including UA.

After Gentry called Schorr at the Foundation's Texas phone number to ask about the RFP, UA sent its application to the Foundation's Texas address. The application identified a number of proposed UA actions and initiatives, all of which were to occur on UA's Alabama campus. The proposed budget requested funds for UA personnel and UA operating costs such as office equipment and travel to the Program's "pilot sites" in Kentucky and Utah.

The Foundation called UA in Alabama to ask about the application. Later, Schorr called Gentry to tell her that UA was one of two universities selected to participate in the Program.

The goal was to establish and implement the Program "on the campus of [UA]." To facilitate that goal, the Foundation expected that UA would: (i) institute a "living learning community" at the UA campus in Alabama, (ii) provide individual guidance to students in Alabama, (iii) provide social and cultural events for students in Alabama, (iv) create a planning team comprised of faculty and staff in Alabama, and (v) establish a "strategic partners team" which was to include "key campus partners" to support the Program.

Between June 2010 and July 2014, UA and the Foundation entered into six contracts to implement the Program (the Agreements). None of the Agreements were negotiated in Texas.[1]

Throughout their five-year relationship, the parties communicated by email and telephone. In addition, UA representatives made seven trips to Texas to meet with other Program participants and the Foundation for training, fundraising and development, strategy

---

[1] The Agreements include the Planning Grant Agreement, The Affiliate Agreement, and four addenda to the Affiliate Agreement. The addenda, executed between June 2012 and July 2014, increased UA's responsibilities, but none were required to occur in Texas.

development, and a "stewardship" visit. But nothing in the Agreements requires UA to travel to Texas, and the Foundation admits that holding events in Texas was simply its preference.

In September 2015, UA notified the Foundation that it would no longer participate in the Program. In response, the Foundation initiated this Texas state court lawsuit.

## C. Trial Court Proceedings

The Foundation's petition alleges specific personal jurisdiction over UA under the Texas Long-Arm statute and includes breach of contract, anticipatory breach, promissory estoppel and unjust enrichment claims. Specifically, the Foundation asserts that UA breached the Agreements by failing to submit various required data, update tracking systems, participate in various group calls, and attend a conference in February 2015. According to the Foundation, the parties' relationship was to continue in perpetuity.

UA filed a special appearance and motion to dismiss for lack of jurisdiction. The special appearance was subsequently amended and attached: (i) the Agreements and addenda, (ii) an affidavit, (iii) deposition excerpts, (iv) several emails, and (v) calendar entries and other assorted attachments.

The Foundation responded and filed three supporting affidavits, deposition excerpts from two UA representatives, and documents produced by the parties.

The trial court conducted a hearing and denied UA's special appearance. This interlocutory appeal followed.

## II. Analysis

## A. Appellant's First Issue: Did the trial court err by determining that it had personal jurisdiction over UA?

### 1. Standard of Review and Applicable Law

Whether a court can exercise jurisdiction over a nonresident is a question of law. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 657 (Tex. 2010). We thus review de novo a trial

–4–

court's order granting or denying a special appearance. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007).

However, the exercise of personal jurisdiction requires the trial court to resolve any factual disputes before applying the jurisdictional formula. *Am. Type Culture Collection, Inc., v. Coleman*, 83 S.W.3d 801, 805–06 (Tex. 2002). When, as here, the trial court does not file findings of fact and conclusions of law in support of its special appearance ruling, we infer all facts necessary to support the judgment and supported by the evidence. *Id.* Once all factual disputes are resolved, we examine de novo whether the facts negate all bases for personal jurisdiction. *Am. Type Culture*, 83 S.W.3d at 806.

Texas courts may exercise personal jurisdiction over a nonresident defendant only if (i) the Texas long-arm statute permits the exercise of jurisdiction and (ii) the jurisdiction satisfies constitutional due-process guarantees. *Id.* Our long-arm statute allows jurisdiction over a nonresident that does business in Texas. TEX. CIV. PRAC. & REM. CODE § 17.042. That statute includes a list of acts that may constitute doing business in this state, including contracting with a Texas resident where either party *is to perform the contract in whole or in part in Texas* or committing a tort in whole or in part in Texas. *Id*. § 17.042(1), (2) (emphasis added).

The "broad doing-business language allows the statute to reach as far as the federal constitutional requirements of due process will allow." *Moki Mac*, 221 S.W.3d at 575. Constitutional due process permits a state to exercise jurisdiction only when a nonresident defendant has sufficient minimum, purposeful contact with the state, and the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice. *Stull v. LaPlant*, 411 S.W.3d 129, 133 (Tex. App.—Dallas 2013, no pet.).

Texas special appearance law dictates that the plaintiff and the defendant bear shifting burdens of proof in a personal jurisdiction challenge. *Id*.; TEX. R. CIV. P. 120a. The plaintiff

bears the initial burden to plead sufficient allegations to invoke jurisdiction under the Texas long-arm statute. *Moki Mac*, 221 S.W.3d at 574. If the plaintiff pleads sufficient jurisdictional allegations, then a defendant who contests the trial court's exercise of personal jurisdiction bears the burden of negating all bases of jurisdiction alleged by the plaintiff. *Id.*

We focus on two prongs when considering specific jurisdiction: (i) purposeful availment and (ii) relatedness. *See Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009).

Purposeful availment is the touchstone of jurisdictional due process. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005). Thus, it is "essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.* (*quoting Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

The purposeful availment prong analyzes (i) the defendant's own actions but not the unilateral activity of another party; (ii) whether the defendant's actions were purposeful rather than random, isolated, or fortuitous; and (iii) whether the defendant sought some benefit, advantage, or profit by availing itself of the privilege of doing business in Texas. *Jani–King Franchising Inc. v. Falco Franchising, S.A.*, No. 05–15–00335–CV, 2016 WL 2609314, at *3 (Tex. App.—Dallas May 5, 2016, no pet.) (citing *Michiana*, 168 S.W.3d at 785). The defendant's activities must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court. *Am. Type Culture*, 83 S.W.3d at 806 (*citing World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). The "quality and nature of the defendant's contacts, rather than their number" governs the inquiry in the minimum contacts analysis. *Id.*

The "relatedness" prong analyzes the relationship among the defendant, the forum, and the litigation. *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 67 (Tex. 2016). Courts may exercise specific jurisdiction when the defendant's forum contacts are "isolated or sporadic" only if the plaintiff's cause of action arises from or relates to those contacts.[2] *TV Azteca v. Ruiz*, 490 S.W.3d 29, 37 (Tex. 2016); *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013). Thus, for a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, there must be a "substantial connection between those contacts and the operative facts of the litigation." *Cornerstone Healthcare Grp. v. Nautic Management, VI L.P.* 493 S.W.3d 65, 73–74 (Tex. 2016); *Moncrief Oil*, 414 S.W.3d at 156.

"The operative facts are those on which the trial will focus to prove the liability of the defendant who is challenging jurisdiction." *Leonard v. Salinas Concrete, LP*, 470 S.W.3d 178, 188 (Tex. App.—Dallas 2015, no pet.). Therefore, we analyze the defendant's contacts "on a claim by claim basis" to determine whether each claim arises out of or is related to the defendant's minimum contacts. *TV Azteca*, 490 S.W.3d at 37.[3] But in so doing, we must not confuse "the roles of judge and jury by equating the jurisdictional inquiry with the underlying merits." *See Michiana*, 168 S.W.3d at 790.

Applying the above principles, we must determine whether a Texas court may properly exercise specific jurisdiction over UA in this case. In addition to the Agreements, the Foundation relies on email, phone calls, travel to Texas, and UA's transmission of data from Alabama to Texas as sufficient minimum contacts to establish jurisdiction in this state. The Foundation also assigns weight to UA's initial telephone inquiry about the Program. As discussed below, we conclude that these contacts do not support specific jurisdiction over UA.

---

[2] "Continuous and systematic" contacts are general jurisdiction concepts, *see Tv Azteca*, 490 S.W.3d at 37, and general jurisdiction is not at issue here.

[3] Here, all of the claims sound in contract, so the analysis is the same.

## 2. Purposeful Availment

Among other things, the Foundation relies on several emails and letters exchanged between UA and the Foundation over five years as a basis for jurisdiction.[4] Both parties initiated these communications throughout the five year relationship. UA knew the Foundation was located in Texas when UA was initiating communications with it. For example, Jessica Franks, UA's Program coordinator, and Leslie Abernathy, UA's Director of Corporate and Foundation Relations, would contact the Foundation to transmit data, report on students' progress, and seek input, guidance, and expertise regarding the Program. Franks also regularly participated in Program working groups by phone or teleconference. For four years, Franks met with one such group once or twice a month, and the Foundation moderated these teleconferences from Texas.

During the same time period, Abernathy participated in teleconferences with a group of affiliate university development representatives, which calls were moderated by a Foundation staff member. These calls involved discussing Program highlights and fundraising strategies, and Abernathy believed that UA was contractually obligated to participate in them. None of the participating affiliate universities, however, were located in Texas.

In the beginning, the group calls between UA, the Foundation, and other Program participants were initiated from the Foundation's Texas office. This changed as more universities participated in the Program, and by 2010, the parties used call-in services for group calls. The call-in numbers for these services did not use numbers associated with Texas.

It is undisputed that the telephone calls, videoconferences, letters, and emails related to the Agreements. But, as the following cases demonstrate, these communications do not establish minimum contacts. *See KC Smash 01, LLC v. Gerdes, Hendrichson, Ltd, L.L.P.*, 384 S.W.3d

---

[4] The parties disagree as to the exact number. But it is the "quality not quantity" of contacts that determines the sufficiency of a nonresident's contacts with Texas. *Televentures, Inc. v. Int'l Game Tech.*, 12 S.W.3d 900, 912 (Tex. App.—Austin 2000, pet. denied).

389, 393 (Tex. App.—Dallas 2012, no pet.) (contacts via phone and email and "the sending of payments" to a party in Texas were not contacts demonstrating purposeful availment); *Olympia Capital Assoc., L.P. v. Jackson*, 247 S.W.3d 399 (Tex. App.—Dallas 2008, no pet.) ("The existence of a contract between the nonresident defendant and a resident of the forum and engaging in communications related to the execution and performance of that contract are insufficient to establish the minimum contacts necessary to support the exercise of specific personal jurisdiction over the nonresident defendant."); *Alenia Spazio, S.p.A. v. Reid*, 130 S.W.3d 201, 213 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) ("numerous telephone and facsimile communications with people in Texas relating to an alleged contract do not establish minimum contacts").

Likewise, sending data to Texas does not establish sufficient contact with the forum. *See 2007 E. Meadows, L.P. v. RCM Phoenix Partners, L.L.C.*, 310 S.W.3d 199, 205 (Tex. App.—Dallas 2010, pet. denied) (sending monthly rent rolls and due diligence to Texas insufficient minimum contacts). UA, however, argues that many of the Agreements required UA to provide the Foundation with various information, including mid and year end reports, data concerning student Program participants, budget expense forms and expense reports, and mentor information. This argument ignores the fact that all of this data was prepared in Alabama before it was transmitted to Texas, and the data concerned activity on the UA campus in Alabama. In other words, the data concerned UA's performance of the contract in Alabama.

Moreover, some of the data was sent to the Foundation's outside consulting firm to analyze before they sent it to the Foundation in Texas. The principals of this consulting firm were, at various times, located in Utah, Ohio, and Iowa.

These data transmissions were just another mode of communicating between UA and the Foundation, which happened to be located in Texas, and jurisdiction should not be determined by

the fortuitous location of the Texas resident when the nonresident communicates with them. *Bryan v. Gordon*, 384 S.W.3d 908, 916-17 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

The Foundation also relies on UA's seven trips to Texas to meet with representatives from other universities participating in the Program. These trips include: (i) a 2010 developmental meeting with the Foundation and other Program participants; (ii) multiple day training sessions in 2012 and 2013; (iii) a celebratory event attended by the Foundation and other Program participants; (iv) a 2013 visit from two UA officials to meet Eric Suder, the Foundation's president; (v) a two-day 2013 meeting attended by other Program participants; and (vi) a 2014 strategic initiatives meeting.

But the Agreements do not require UA representatives to travel to Texas, nor was UA ever informed that Texas travel would be required. And, the Foundation admits that holding events in Texas was simply a matter of preference.

Furthermore, the contract-related travel did not always involve UA traveling to Texas. Foundation personnel also traveled to UA's Alabama campus five to seven times during the parties' relationship. One 2014 event was held at the University of Kentucky campus in Lexington, Kentucky.

Finally, the Foundation relies on the parties' contractual relationship itself as a basis for jurisdiction. It argues that UA first "reached out" to the Foundation to inquire about the Program, transmitted the signed Agreements, partially performable in Texas, to Texas, and received over $1,000,000 in funding from a Texas entity. The Foundation also claims that by entering into this contractual relationship that was allegedly to continue "in perpetuity," UA purposefully availed itself of the privilege of conducting activities in Texas. We disagree.

Contracting with a Texas residents does not of itself constitute purposeful availment. *Ahrens v. DeAngelli, P.L.L.C. v. Flinn*, 318 S.W.3d 474, 484 (Tex. App.—Dallas 2010, pet.

–10–

denied); *Counter Intelligence, Inc. v. Calypso Water Jet Sys., Inc.*, 216 S.W.3d 512, 518 (Tex. App.—Dallas 2007, pet. denied). Instead, a contract's significance in our minimum contacts analysis turns on (i) prior negotiations; (ii) contemplated future consequences; (iii) terms of the contract; and (iv) the actual course of dealing. *See Gustafson v. Provider HealthNet Servs., Inc.*, 118 S.W.3d 479, 483 (Tex. App.—Dallas 2003, no pet.) (*citing Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985)). Even a sustained contractual relationship with a Texas resident does not support the exercise of jurisdiction if the contract is centered around the nonresident's "operations outside Texas." *McFadin v. Gerber*, 587 F.3d 753,760 (5th Cir. 2009).

The Agreements at issue here were not negotiated. Rather, they were entered into after the Foundation solicited RFP's on a nationwide basis and UA responded. While UA may have contacted the Foundation to generally inquire about the Program prior to the RFP, the parties' contractual relationship did not result from this initial contact. Thus, parties' the pre-contractual relationship does not weigh heavily in our analysis.

The Agreement's terms and the parties' performance, however, are instructive here. According to the Foundation, the Agreement's purpose was to establish and implement the Program "on the campus of the University of Alabama." The Foundation awarded approximately $1,000,000 in scholarships for UA students, who were expected to reside on campus in Alabama. Indeed, the Program's focus pertaining to UA was first generation UA college students, and the activities identified by UA in its RFP were all to be performed on UA's campus in Alabama. These activities included: (i) utilizing a UA-based program coordinator and graduate assistant; (ii) providing a "living learning community" for students on campus; (iii) freshman and individual tutoring; (iv) customized orientation and a special class; (iv) and utilization of a UA core planning team.

Under the initial agreement, the Planning Grant agreement, the Foundation provided a $60,000 grant to UA, which was obligated to:

- engage campus departments in developing the Program on UA's campus,

- participate in calls with representatives from the Foundation and other Program sites,

- visit the University of Kentucky and the University of Iowa for insight and information concerning the Program, and

- collaborate with other Program sites and the outside data consultants located in Iowa and Utah.

UA also agreed to refine and develop materials for the Program and provide the Foundation with its work product, including sample documents, policies, procedures and strategies.

Although UA agreed to indemnify the Foundation under Alabama law, there was no choice of law provision in the Planning Grant Agreement or any of the other Agreements. In addition, the Foundation does not identify, nor do we discern, any express contractual provision requiring UA to perform in Texas.

The Affiliate Agreement provided additional funding for scholarships and UA's operation of the Program. The Affiliate Agreement further provided that the Foundation and "one or more [affiliate] universities could visit the UA campus for "training and/or collaborative work session[s]."

Other than funds for travel to Colorado and Kentucky, the operating costs identified in the Affiliate Agreement were to be expended at UA's campus in Alabama. An additional $82,000 was designated to help UA create an on-campus infrastructure to support its student participants.

The Affiliate Agreement also specified the responsibilities of UA's Program Coordinator, Jessica Franks. Franks was required to: (i) manage the Program at UA, (ii) create a welcoming atmosphere for student participants; (iii) work with students, admissions, scholarships, and financial aid offices; and (iv) participate in status calls with the Foundation and other Program participants.

Thus, the Agreements established that the funding which forms the basis of the parties' relationship was intended to be, and was, primarily spent in Alabama. UA's contractual obligations to develop the Program, participate in calls and collaborate with other Program participants and outside data consultants were primarily to be performed in Alabama. Other than travel funds for visiting other non-Texas based Program participants, the operating costs identified in the Agreements were to be expended in Alabama. Thus, UA's contract performance was substantially in Alabama, and the parties' contractual relationship was centered in Alabama, not Texas. These circumstances do not establish "purposeful availment." *See Guardian Royal Exc. Assn., Ltd. v. English China Clays*, *P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991).

The Foundation does not dispute that there was at least partial performance in Alabama, but it insists that UA was also obligated "to assist in the development of the Texas-based Foundation's *national* program" and to provide the Foundation with data "to promote its larger *nationwide* mission." (Emphasis added). This national focus, however, underscores that the contractual relationship was not Texas-centered.

The Foundation also argues that the emails, Texas travel, phone calls, and other "singular connections to Texas" cannot be viewed in isolation, and collectively demonstrate "continuing and wide-reaching contacts" in an "ongoing business relationship." *See Burger King*, 471 U.S. at 480; *Texva*, 300 S.W.3d at 887. But, as discussed below, this argument ignores that there is no

–13–

"substantial connection between these contacts and the operative facts of the litigation." *Moki Mac*, 221 S.W.3d at 585.

### 3. Relatedness

The Foundation contends that the litigation is related to Texas because its "claim regarding breaches of the Agreements arises from [UA's] failure to perform under those agreements in Texas." We disagree.

The analysis of whether a cause of action is related to the defendant's activities in the forum focuses on the defendant's activities rather than the plaintiff's residence. *Tv Azteca*, 490 S.W.3d at 42. UA's Texas contacts must be more than the "random, fortuitous, or attenuated" contacts it made by interacting with an entity in this state. *See Walden v. Fiore,* 134 S.Ct. 1115, 1123 (2014); *Burger King*, 471 U.S. at 475.

Here, the litigation involves UA's alleged breach of contract and related claims. Specifically, the Foundation argues that UA breached the Agreements by failing to (i) send the Foundation a 2014 mid-year report, (ii) send the UA coordinator to attend a Texas conference, (iii) participate in monthly calls with the Foundation, and (iv) submit posts to the Foundation for its national website. Yet none of these activities were contractually required to be performed in Texas.

Thus, the Foundation's relatedness argument relies on an erroneous premise—that the above actions were "Texas focused obligations." We have already concluded, however, that UA's contractual obligations, when specified, were to be performed in Alabama. Because performance was to occur in Alabama, it follows that any alleged breach would occur there as well. *See Televentures,* 12 S.W.3d at 910 (breach occurs where party fails to perform); *see also Ashdon, Inc. v. Gary Brown & Assocs., Inc.*, 260 S.W.3d 101, 113 (Tex. App.—Houston [1st

Dist.] 2008, no pet.) (contract calling for nonresident's performance outside Texas will not subject nonresident to jurisdiction here).

In an effort to demonstrate that the contract was performable in Texas, the Foundation asserts that the Texas location of the Foundation and its employees is significant. But our analysis focuses on the defendant's activities rather than the plaintiff's residence. *Tv Azteca*, 490 S.W.3d at 42. UA's Texas activities included phone calls, emails, and transmitting to Texas and Texas visits. None of these activities, however, are related to the operative facts of the Foundation's claims and would not be the trial's focus. *See id*. at 53. Instead, the trial would focus on whether UA's performance in Alabama failed. Therefore, we conclude that the litigation does not arise out of or relate to UA's activities in Texas. *See Asshauer v. Glimcher Realty Trust*, 228 S.W.3d 922, 932–33 (Tex. App.—Dallas 2007, no pet.).

### 4. Fair Play and Substantial Justice

Because we conclude that the Foundation does not have the required minimum contacts with Texas, we need not consider whether the assertion of jurisdiction over UA would be consistent with traditional notions of fair play and substantial justice. *Crossroads Financial, LLC v. A.D.I.M Global Co. Ltd*., No. 05-16-00486-CV, 2016 WL 7220970, at *10, n.10 (Tex. App.—Dallas Dec. 13, 2016, no pet.); *Olympia Cap. Assoc., L.P. v. Jackson*, 247 S.W.3d 399, 422 n.8 (Tex. App.—Dallas 2008, no pet.).

**B.** **Appellant's Second Issue:** **Is the evidence legally and factually sufficient to support the order?**

Because our disposition of appellant's first issue disposes of the case, we need not and do not reach its second issue.

### III. Conclusion

For the reasons discussed above, we conclude that the trial court erred in denying UA's special appearance because UA negated the Foundation's alleged bases of specific jurisdiction.

We thus resolve UA's sole issue in its favor, reverse the trial court's order denying UA's special appearance, and render judgment dismissing the Foundation's claims against it for lack of personal jurisdiction.

/Bill Whitehill/

BILL WHITEHILL
JUSTICE

160691F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

THE UNIVERSITY OF ALABAMA,
Appellant

No. 05-16-00691-CV        V.

THE SUDER FOUNDATION, Appellee

On Appeal from the 191st Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-15-08295.
Opinion delivered by Justice Whitehill.
Justices Lang and Brown participating.

In accordance with this Court's opinion of this date, the order of the trial court is **REVERSED** and judgment is **RENDERED** dismissing the THE SUDER FOUNDATION's claims against THE UNIVERSITY OF ALABAMA for want of personal jurisdiction.

It is **ORDERED** that appellant THE UNIVERSITY OF ALABAMA recover its costs of this appeal from appellee THE SUDER FOUNDATION.

Judgment entered February 17, 2017.