ACCEPTED
03-15-00348-CV
6165399
THIRD COURT OF APPEALS
AUSTIN, TEXAS
7/21/2015 5:00:30 PM
JEFFREY D. KYLE
CLERK

**No. 03-15-00348-CV**

_____

COURT OF APPEALS
THIRD JUDICIAL DISTRICT OF TEXAS
AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
7/21/2015 5:00:30 PM
JEFFREY D. KYLE
Clerk

_____

TODD ENRIGHT,

*Appellant*,

v.

ASCLEPIUS PANACEA, LLC; ASCLEPIUS PANACEA GP, LLC; DAILY PHARMACY, LLC; DAILY PHARMACY GP, LLC; AND TOTH ENTERPRISES II, P.A. D/B/A VICTORY MEDICAL CENTER,

*Appellees*.

_____

**BRIEF OF APPELLANT
TODD ENRIGHT**

_____

On Appeal from the 98th Judicial District Court
of Travis County, Texas
Trial Court No. D-1-GN-14-004689
Hon. Gisela D. Triana of the 200th Judicial District Court, Presiding

_____

Thomas S. Leatherbury
   State Bar No. 12095275
Vinson & Elkins LLP
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201
Telephone:  (214) 220-7700
Facsimile:  (214) 999-7792
tleatherbury@velaw.com

Jennifer B. Poppe
   State Bar No. 24007855
Jonah Jackson
   State Bar No. 24071450
Vinson & Elkins LLP
2801 Via Fortuna, Suite 100
Austin, Texas 78746
Telephone:  (512) 542-8400
Facsimile:  (512) 542-8612
jpoppe@velaw.com
jjackson@velaw.com

***Attorneys for Appellant Todd Enright***

**ORAL ARGUMENT REQUESTED**

## IDENTITY OF PARTIES AND COUNSEL

1. **Appellant Todd Enright**

| | |
|---|---|
| Thomas S. Leatherbury | Jennifer B. Poppe |
| Vinson & Elkins LLP | Jonah Jackson |
| 2001 Ross Avenue, Suite 3700 | Vinson & Elkins LLP |
| Dallas, Texas 75201 | 2801 Via Fortuna, Suite 100 |
| Telephone: (214) 220-7700 | Austin, Texas 78746 |
| Facsimile: (214) 999-7792 | Telephone: (512) 542-8400 |
| tleatherbury@velaw.com | Facsimile: (512) 542-8612 |
| | jpoppe@velaw.com |
| | jjackson@velaw.com |

2. **Appellees Asclepius Panacea, LLC; Asclepius Panacea GP, LLC; Daily Pharmacy, LLC; Daily Pharmacy GP, LLC; and Toth Enterprises II, P.A. d/b/a Victory Medical Center**

Eric J. Taube
Paul Matula
Taube Summers Harrison Taylor Meinzer Brown, LLP
100 Congress Avenue, 18th Floor
Austin, Texas 78701
etaube@taubesummers.com
pmatula@taubesummers.com

3. **Defendants QVL Pharmacy #181 GP, LLC; QVL Pharmacy #162 GP, LLC; and QVL Pharmacy Holdings, Inc. (not parties to this appeal)**

QVL is not currently represented by counsel.

Former counsel:
Christine Kirchner
Cade W. White
Chamberlain, Hrdlicka, White, Williams & Aughtry
1200 Smith Street, Suite 1400
Houston, Texas 77002
c.kirchner@chamberlainlaw.com
cade.white@chamberlainlaw.com

i

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ...........................................................i

TABLE OF CONTENTS .................................................................................... ii

TABLE OF AUTHORITIES ..............................................................................iv

RECORD REFERENCES ...................................................................................vi

STATEMENT REGARDING ORAL ARGUMENT ........................................ vii

STATEMENT OF THE CASE.......................................................................... viii

ISSUES PRESENTED.........................................................................................x

STATEMENT OF THE FACTS ........................................................................... 1

SUMMARY OF THE ARGUMENT .................................................................10

STANDARD OF REVIEW ...............................................................................11

ARGUMENT .....................................................................................................12

I.   Exercise of personal jurisdiction over Enright does not meet the requirements of due process. ........................................................................12

  A. While representing White Winston in negotiating and providing the purchase loan to VMC, Enright did not purposely avail himself of the privileges of conducting business within Texas, so as to invoke the benefits and protections of Texas law. ...................................15

  B. The exercise of specific jurisdiction over Enright is improper because his contacts with Texas have no substantial connection to the alleged torts. ...........................................................................................19

    1.  The factual basis for VMC's post-transaction claims is unrelated to Enright's contacts with Texas. ..........................................19

    2.  Because all of VMC's claims fail as a matter of law, Enright's contacts with Texas cannot possibly be "substantially connected" to any tortious conduct. ...................................23

  C. Exercise of personal jurisdiction over Enright does not comport with traditional notions of fair play and substantial justice. ...............................26

II.  The trial court's order is not supported by the evidence in the record.............27

  A. The evidence is legally and factually insufficient to support the inference that Enright could have made any alleged misrepresentation to VMC prior to the transaction...................................28

B. The evidence is legally and factually insufficient to support the inference that Enright could have interfered with the TSA. ........................30

CONCLUSION AND PRAYER ........................................................................32

CERTIFICATE OF COMPLIANCE ................................................................34

CERTIFICATE OF SERVICE .........................................................................35

APPENDIX ......................................................................................................36

iii

# TABLE OF AUTHORITIES

**Cases**

*ACS Investors, Inc. v. McLaughlin*,
943 S.W.2d 426 (Tex. 1997)..................................................................14

*Ashdon, Inc. v. Gary Brown & Assocs., Inc.*,
260 S.W.3d 101 (Tex. App.—Houston [1st Dist.] 2008, no pet.) .......................27

*BMC Software Belgium, N.V. v. Marchand*,
83 S.W.3d 789 (Tex. 2002)...................................................................12

*Botter v. Am. Dental Ass'n*,
124 S.W.3d 856 (Tex. App.—Austin 2003, no pet.) ...........................................12

*Briggs v. Seacoast Power, L.L.C.*,
No. 03-01-00286-CV, 2001 WL 1346137
(Tex. App.—Austin Oct. 25, 2001, no pet.) ......................................................22

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985) ...........................................................................15

*Butnaru v. Ford Motor Co.*,
84 S.W.3d 198 (Tex. 2002)...................................................................25

*Daimler AG v. Bauman*,
134 S. Ct. 746 (2014) .........................................................................13

*Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*,
815 S.W.2d 223 (Tex. 1991)........................................................... 13, 26

*Helicopteros Nacionales de Colombia S.A. v. Hall*,
466 U.S. 408 (1984) ...........................................................................12

*Int'l Shoe Co. v. Washington*,
326 U.S. 310 (1945) ...........................................................................13

*Kaye/Bassman Int'l Corp. v. Dhanuka*,
418 S.W.3d 352 (Tex. App.—Dallas 2013, no pet.).............................................14

*Kelly v. Gen. Interior Constr., Inc.*,
301 S.W.3d 653 (Tex. 2010)..................................................................11

*Merrell Dow Pharm., Inc. v. Havner*,
953 S.W.2d 706 (Tex. 1997)..................................................................12

*Michiana Easy Livin' Country, Inc. v. Holten*,
168 S.W.3d 777 (Tex. 2005)........................................................ 16, 17, 18, 23

*Moki Mac River Expeditions v. Drugg*,
  221 S.W.3d 569 (Tex. 2007)......................................................... passim

*Moncrief Oil Int'l Inc. v. OAO Gazprom*,
  414 S.W.3d 142 (Tex. 2013).....................................................13

*Nat'l Indus. Sand Ass'n v. Gibson*,
  897 S.W.2d 769 (Tex. 1995).....................................................23

*Panda Brandywine Corp. v. Potomac Elec. Power Co.*,
  253 F.3d 865 (5th Cir. 2001)...................................................15

*PHC-Minden, L.P. v. Kimberly-Clark Corp.*,
  235 S.W.3d 163 (Tex. 2007).....................................................12

*Revell v. Lidov*,
  317 F.3d 467 (5th Cir. 2002)...................................................15

*Stull v. LaPlant*,
  411 S.W.3d 129 (Tex. App.—Dallas 2013, no pet.)............................14

*TeleVentures, Inc. v. Int'l Game Tech.*,
  12 S.W.3d 900 (Tex. App.—Austin 2000, pet. denied) ................... 16, 21, 22, 24

*Wolf v. Summers-Wood, L.P.*,
  214 S.W.3d 783 (Tex. App.—Dallas 2007, no pet.)............................13

**Statutes**

Tex. Civ. Prac. & Rem. Code Ann. § 17.042(2)......................................23

**Rules**

Tex. R. App. P. 28.1(c) ............................................................9

Tex. R. Civ. P. 296................................................................9

## RECORD REFERENCES

The reporter's record will be cited as follows:

[Volume]RR[page(s)].

The clerk's record will be cited as follows:

CR[page(s)].

The exhibits at CR400-528, which are attached to Plaintiffs' Response to Defendant Todd Enright's First Amended Special Appearance (CR367-97) (***Response***), do not appear in their original order as listed in Plaintiffs' Index of Exhibits at CR398-99.  For the sake of clarity, please note that the exhibits to the Response are located in the clerk's record as follows:

| | |
|---|---|
| Exhibit 1 – CR435-40 | Exhibit 16 – CR455-59 |
| Exhibit 1-A – CR465-66 | Exhibit 17 – CR411-12 |
| Exhibit 2 – CR467-96 | Exhibit 18 – CR417-18 |
| Exhibit 3 – CR497-514 | Exhibit 19 – CR441-44 |
| Exhibit 4 – CR445-54 | Exhibit 21 – CR423-25 |
| Exhibit 5 – CR525-26 | Exhibit 22 – CR426-29 |
| Exhibit 7 – CR403-05 | Exhibit 31 – CR527-28 |
| Exhibit 10 – CR406-10 | Exhibit 33 – CR400-02 |
| Exhibit 11 – CR430-34 | Exhibit 37 – CR460-62 |
| Exhibit 12 – CR413-16 | Exhibit 39 – CR463-64 |
| Exhibit 14 – CR515-21 | Exhibit 40 – CR419-22 |
| Exhibit 15 – CR522-24 | |

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Todd Enright respectfully requests the opportunity to present oral argument in this appeal.  Appellant believes that oral argument will assist the Court in better understanding the record and in applying the law to the facts.

TO THE HONORABLE COURT OF APPEALS:

Appellant Todd Enright (***Enright***) submits this brief in accordance with Texas Rules of Appellate Procedure 9.4 and 38.1.

## STATEMENT OF THE CASE

Enright seeks review of the trial court's order of May 15, 2015, denying Enright's special appearance. Appellees Asclepius Panacea, LLC; Asclepius Panacea GP, LLC; Daily Pharmacy, LLC; Daily Pharmacy GP, LLC; and Toth Enterprises II, P.A. d/b/a Victory Medical Center (collectively, ***VMC***) filed this lawsuit on November 10, 2014, asserting claims against Enright in his individual capacity in connection with their purchase and operation of two pharmacies from QVL Pharmacy #181 GP, LLC; QVL Pharmacy #162 GP, LLC; and QVL Pharmacy Holdings, Inc. (collectively, ***QVL***).[1] CR3.

Enright, a New Hampshire resident, is an agent of White Winston Select Asset Funds, LLC (***White Winston***), which financed VMC's purchase of QVL's pharmacies. Enright filed his special appearance on December 15, 2014, which he amended on April 21, 2015, challenging the Court's exercise of personal jurisdiction over him. CR39 & 179. The Honorable Gisela D. Triana heard Enright's special appearance on April 30, 2015. CR177; 2RR1. On May 15, 2015,

---

[1] VMC also asserted claims against the QVL entities, but QVL is not a party to this appeal.

Judge Triana issued an order denying the special appearance. CR567. Enright timely filed a notice of appeal on June 3, 2015. CR592.

# ISSUES PRESENTED

1. Did the trial court err in concluding that Enright purposefully availed himself of the benefits of doing business in Texas?

2. Did the trial court err in concluding that VMC's claims against Enright are substantially connected to Enright's contacts with Texas?

3. Did the trial court err in concluding that the exercise of personal jurisdiction over Enright comports with the traditional notions of fair play and substantial justice?

4. Did the trial court err in concluding that the evidence was factually sufficient to support the exercise of personal jurisdiction?

5. Did the trial court err in concluding that the evidence was legally sufficient to support the exercise of personal jurisdiction?

6. Did the trial court err in denying Enright's special appearance?

## STATEMENT OF THE FACTS

Enright, a New Hampshire resident, is a partner with White Winston, a Utah company with offices in Boston, Massachusetts. CR227 (¶ 3); CR499-501. White Winston invests its funds in public and private debt. CR228 (¶ 6). White Winston is the senior creditor as part of QVL's debt portfolio. CR228 (¶ 6). Until 2014, QVL operated several retail pharmacy locations in Texas and Louisiana. CR345 (¶ 3). Enright, on behalf of White Winston, served as QVL's point of contact relating to QVL's debt.

During the fall of 2013, QVL began to refocus its business on pharmacy services and proprietary software and resolved to divest itself of its retail pharmacies. CR359-60; CR479. To further this divestiture, QVL's then-CEO, Gary Chad Collins, identified and contacted potential buyers for each of QVL's pharmacy locations. In early December 2013, Mr. Collins called Dr. William Franklin, the owner of Victory Medical Center, to determine VMC's interest in purchasing QVL's nearby Austin, Texas pharmacy location. CR345-46 (¶ 4); CR356-57. Dr. Franklin told Mr. Collins that he was very interested in the Austin location and, potentially, other locations as well. CR346 (¶ 4); CR359-60; CR436 (¶ 2).

Soon after QVL's initial discussions with VMC, Mr. Collins and Dr. Franklin approached White Winston to discuss whether the company would

lend VMC money to finance their acquisition of the two QVL pharmacies. CR358; CR362; CR437 (¶ 3). Mr. Collins invited Enright to a conference call with Dr. Franklin on December 12, 2013. CR226; CR346 (¶ 6); CR437 (¶ 3). During that conference call, Enright told Dr. Franklin that he represented White Winston, and the two broadly discussed the terms of a possible purchase loan that would accommodate VMC's desired equity purchase. CR228 (¶ 6); CR346 (¶ 6).

Enright had only a few additional communications with VMC's representatives before the agreements were finalized on December 31, 2013. After the December 12 call, Enright exchanged emails with VMC's representatives, including Dr. Franklin, to obtain the necessary financial documents from VMC. CR228 (¶ 7); CR466. In late December, Enright participated in one additional conference call with representatives of VMC and QVL to discuss coordination of the transaction and White Winston's financing. CR228 (¶ 7). Between the second conference call and the close of the transaction on December 31, 2013, Enright had no further contacts with VMC, although lawyers from both parties kept White Winston informed of the transaction's progress via email, including the exchange of drafts of the agreements between VMC and QVL. CR228 (¶ 7); CR401; CR526; CR528.

VMC eventually agreed to purchase two of QVL's pharmacies, including the Austin location. In order to accommodate VMC's desire to assume operation of

2

the two pharmacies without interruption, QVL and VMC structured the transaction as an equity purchase rather than an asset purchase. CR346. VMC and QVL negotiated and agreed to terms over the span of only a few weeks, and executed a Purchase Agreement on December 31, 2013. Although not involved directly in VMC's transaction, White Winston did lend VMC $675,000 for the purchase through a loan agreement and related documents dated December 31, 2013.[2] CR229-30 (¶¶ 12-20); CR232-339.

Enright's contacts with Texas during VMC's negotiations with QVL were minimal. He did not participate in due diligence or otherwise discuss the transaction—other than those aspects of the transaction that related to the financing provided by White Winston—with Dr. Franklin or any other representative of VMC. CR228 (¶ 6); CR346-47 (¶¶ 6-7). Enright (along with White Winston's attorney) was involved only in the negotiation of VMC's financing on behalf of White Winston. Enright never traveled to Texas during the negotiations between VMC and QVL and had no contact with Dr. Franklin or any of VMC's representatives beyond the two telephone calls in December and emails related to

---

[2] The terms and conditions of the loan are set forth in a Loan Agreement, a Secured Promissory Note, a Securities Pledge Agreement, a Security Agreement, an Escrow Agreement, a Priority and Release Agreement, and two Guaranties.

the financing.[3]   CR228 (¶¶ 6-7); CR346-47 (¶¶ 6-7).   Enright's sole role was to represent White Winston in the negotiation and execution of its loan to VMC.

The loan agreement documents were negotiated and drafted by VMC's and White Winston's attorneys and executed on behalf of White Winston by Enright. Unlike the Purchase Agreement and Transition Services Agreement, discussed more fully below, which Enright did not negotiate, all of the loan agreements establish Massachusetts as the mandatory jurisdiction and venue for any dispute. CR250; CR266; CR284-85; CR297; CR315; CR327; CR336.  As part of the loan agreement, White Winston also released its interest in the assets of the two pharmacies, which had served as part of the collateral for QVL's debt held by White Winston and other creditors it represented.  CR228 (¶ 6); CR282-85.

As part of the Purchase Agreement, QVL and VMC also entered into the Transition Services Agreement (*TSA*) through which QVL agreed to provide VMC with certain administrative and support services.  CR549-65.   Neither White Winston nor Enright negotiated the Purchase Agreement or the TSA or was a party to either agreement.

---

[3] Enright and White Winston's attorney were also periodically informed by QVL's attorney of negotiations between QVL and VMC. *See* CR401; CR526; CR528.  As QVL's senior creditor, White Winston was required to release its security interest in the two pharmacies' assets at the time of sale, and therefore White Winston had an interest in whether VMC's compensation to QVL adequately reflected the security interest that White Winston was releasing.  CR282-93.

4

The TSA established an ongoing relationship between QVL and VMC. Under the TSA, QVL was to continue to collect and process the accounts receivable for the two pharmacies and, each month, reconcile QVL's services against receipts. CR565. VMC were also permitted, although not required, to purchase prescription drugs for the two pharmacies through QVL's existing relationship with AmerisourceBergen Drug Corporation (**ABDC**). CR565. Monthly payments were to be based on a reconciliation of the gross receipts attributable to the two stores, offset by the cost of services provided by QVL (including VMC's drug purchases through ABDC) and VMC's share of certain pro-rata charges such as software licenses and QVL overhead. CR565. The TSA services were primarily provided by two QVL employees, Joyce Montgomery and Sandra Gonzales.[4]

Enright had limited contacts with Texas, and none in his individual capacity, after VMC's purchase of QVL's pharmacies. On behalf of White Winston, Enright continued to communicate with QVL and its agents concerning White Winston's role as QVL's senior creditor. Enright also served as QVL's point of contact at White Winston concerning the credit facility that QVL used to make operational payments, including payments to VMC.

---

[4] Ms. Montgomery and Ms. Gonzales later left QVL, but continued to provide the services to VMC as contractors for QVL.

5

Enright traveled to Texas on business for White Winston 4 times in 2014, to review QVL's collateral and performance under agreements with White Winston and met with Dr. Franklin on two of those trips. CR229 (¶ 10). First, in mid-January 2014, Enright traveled with Mr. Collins to Austin where Dr. Franklin provided a tour of VMC's facilities. CR209 (¶ 4). Second, Enright again met briefly with Dr. Franklin in Austin in April of 2014, also while in Texas on business for White Winston, unrelated to VMC. CR209 (¶ 4). Around the time of their second meeting, Dr. Franklin was negotiating with QVL to amend or terminate the TSA. CR209 (¶ 4); CR431-32. Dr. Franklin and Enright discussed whether and how the potential changes to the TSA would affect VMC's loan agreement with White Winston. CR209 (¶ 4).

The post-transaction relationship between VMC and QVL was not entirely smooth. In late January, less than a month after the transaction, VMC found themselves unable to purchase their desired amount of drug inventory through QVL's credit facility with ABDC. CR208-09 (¶ 3). VMC had apparently already purchased a larger than expected amount of prescription drugs and were unable to pay the balance owed to ABDC, which in turn affected QVL's credit with ABDC. CR208-09 (¶ 3).

VMC's cash flow problems also affected their ability to make payments on White Winston's loan. To resolve the issue, VMC approached White Winston

6

again and requested a loan increase and modification of the repayment terms. CR208-09 (¶ 3); CR228(¶ 7). White Winston advanced VMC an additional $182,000 on January 31, 2014, through the execution of a Promissory Note Modification Agreement. CR228 (¶ 7); CR341-44.[5] At the time of the modification, White Winston, QVL, and VMC also executed a First Amendment to Priority and Release Agreement that recognized and affirmed VMC's obligations to pay QVL for services under the TSA and provided that certain creditors of QVL, represented by White Winston, would retain an interest in the assets of the two acquired pharmacies equal to any amounts owed under the TSA. CR213-14.

Some months later, VMC experienced further difficulties with QVL, this time concerning payments allegedly due by QVL to VMC under the TSA. QVL was by this time at or above the limit of its credit facility with White Winston and unable to timely make operating payments, including payments claimed by VMC. In mid-July, after several months of difficulty, QVL secured enough credit availability to send VMC a check for $64,752.45, approximately half of what QVL believed it owed VMC. CR210 (¶ 7); CR456; CR523. QVL drafted a check for the second half at the same time but held it while waiting for additional credit to

---

[5] As part of that agreement, VMC released White Winston and its "agents, employees, representatives, directors, officers, members, managers, successors and assigns . . . from any and all claims, counterclaims, demands, actions and causes of action of any nature whatsoever, whether at law or in equity . . . from the beginning of the world to the date of this Agreement." CR342.

become available.  CR210 (¶ 7); CR422.  On July 22, 2014, Dr. Franklin sent Enright an email accusing White Winston of interfering with QVL's check and threatening to sue both White Winston and Enright.  CR461-62.  Enright responded that White Winston had not taken any action relating to QVL's check, reminded Dr. Franklin that White Winston, as QVL's senior creditor, merely provided QVL with a credit facility subject to draw request procedures and collateral agreements, and advised Dr. Franklin to contact QVL concerning the disputed payment.  CR461.

Shortly thereafter, on or about August 7, 2014, White Winston, in an effort to protect its interests and avoid litigation, offered to advance QVL funds beyond its credit limit, for the purpose of making the final payment to VMC.  As a condition for this extension of further credit to QVL for VMC's benefit, White Winston asked Dr. Franklin and VMC to release the threatened claims against White Winston and its agents.  CR427; CR464.  VMC declined the offer.

On or about August 27, 2014, one of QVL's contractors, Sandra Gonzales, under the mistaken impression that White Winston had approved the additional credit that was predicated on VMC's release, sent the second check to VMC.  CR424; CR427.  However, because QVL still did not actually have any credit available, the issuing bank, Boston Private Bank & Trust Co., automatically rejected the check when presented by VMC's bank.  CR420-22; CR424.  When

Boston Private Bank notified White Winston that an attempt had been made to draw on the checking account tied to QVL's credit facility, Enright confirmed that White Winston had not authorized any additional credit. CR427; CR424.

On November 10, 2014, VMC filed suit for claims relating to the purchase and QVL's performance under the TSA. CR3-36. VMC did not name White Winston as a defendant, but did sue Enright in his individual capacity. VMC's claims against Enright are for fraudulent misrepresentations in December 2013 and for tortious interference with the TSA during 2014.[6] CR542-44. Enright filed a special appearance on December 15, 2014, challenging the Court's exercise of personal jurisdiction. CR39-56. VMC sought extensive discovery over the following months, and Enright filed his First Amended Special Appearance on April 21, 2015. CR179-207. VMC filed their Response to the special appearance and an amended petition on April 23, 2015. CR367-99; CR529-47. After a hearing on the special appearance on April 30, 2015, the trial court denied the special appearance on May 15, 2015. CR567. Enright timely filed a notice of appeal June 3, 2015, perfecting his interlocutory appeal from the denial. CR592-94. Enright requested that the trial court file findings of fact and conclusions of law pursuant to Texas Rule of Civil Procedure 296 and Texas Rule of Appellate Procedure 28.1(c), but the court declined. CR598-600.

---

[6] VMC also asserted claims for conversion and money had and received. According to VMC, the "same evidence" supports these claims. CR385-86.

## SUMMARY OF THE ARGUMENT

The trial court's denial of Enright's special appearance rests on two fundamental errors, either of which provides a ground for this Court to reverse. First, the court erroneously concluded that each of the three due process requirements was satisfied when, in truth, none is—Enright does not have the necessary minimum contacts with Texas, his contacts are not substantially related to VMC's claims, and the exercise of personal jurisdiction would not comport with the traditional notions of fair play and substantial justice. Second, and independently, the trial court erred in its implicit conclusion that there was sufficient evidence of facts necessary to support jurisdiction.

Texas may not, consistent with the requirements of due process, exercise personal jurisdiction over a New Hampshire resident employed in Boston, Massachusetts by a Utah company, who has no contacts with Texas as an individual. Enright's only contacts with Texas have been as White Winston's agent, most of which have no connection to VMC, let alone to the substance of VMC's claims. All of Enright's contacts with Texas relating to VMC sprang from the unilateral activity of Mr. Collins and Dr. Franklin, who first reached out to White Winston seeking financing for VMC's purchase of two QVL pharmacies. These attenuated contacts resulting from the unilateral actions of other parties are insufficient to support the exercise of personal jurisdiction. Furthermore, VMC's

10

claims are not substantially related to Enright's contacts, as required by due process.

VMC's suit is also an improper attempt to avoid mandatory jurisdiction in Massachusetts by suing White Winston's agent as an individual. Permitting it to proceed would violate the traditional notions of fair play and substantial justice. Finally, even if VMC's jurisdiction allegations could theoretically pass constitutional muster, the exercise of jurisdiction is improper for the separate reason that there is insufficient evidence of necessary facts. Because of these errors, this Court should reverse the trial court's order denying Enright's special appearance and dismiss Appellees' claims against Enright for lack of personal jurisdiction.

## STANDARD OF REVIEW

Whether a court has personal jurisdiction over a nonresident defendant is a question of law that is reviewed de novo. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007). VMC had the initial burden of pleading sufficient allegations to invoke jurisdiction against Enright under the Texas long-arm statute. *See id.* "If the plaintiff fails to plead facts bringing the defendant within reach of the long-arm statute (*i.e.*, for a tort claim, that the defendant committed tortious acts ***in Texas***), the defendant need only prove that it does not

11

live in Texas to negate jurisdiction." *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658-59 (Tex. 2010) (emphasis added).

Because the trial court declined to issue findings of fact in this case, "all facts necessary to support the judgment and supported by the evidence are implied." *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). However, implied findings are not conclusive, and "may be challenged for legal and factual sufficiency" when the clerk's and reporter's records are before the court of appeals. *Id.* Evidence is factually insufficient if the necessary findings are "contrary to the great weight and preponderance of the evidence." *Botter v. Am. Dental Ass'n*, 124 S.W.3d 856, 861 (Tex. App.—Austin 2003, no pet.). There is legally insufficient evidence of a vital fact when, inter alia, there is a complete absence of evidence, the evidence offered to prove a vital fact is no more than a mere scintilla, or the evidence conclusively establishes the opposite of the vital fact. *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)

## **ARGUMENT**

I.  **Exercise of personal jurisdiction over Enright does not meet the requirements of due process.**

VMC's attempt to bring claims against Enright in Texas does not comport with the three constitutional due process requirements for specific jurisdiction.[7]

---

[7] A nonresident's sufficient minimum contacts can give rise to either "general" jurisdiction or "specific" jurisdiction. *Helicopteros Nacionales de Colombia S.A. v. Hall*,

12

*Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 227-28 (Tex. 1991). "For a Texas forum to properly exercise specific jurisdiction . . . (1) [the defendant] must have made minimum contacts with Texas by purposefully availing itself of the privilege of conducting activities here, and (2) [the defendant]'s liability must have arisen from or related to those contacts." *Moki Mac*, 221 S.W.3d at 576. Third, even if the minimum contacts and substantial relation requirements are satisfied, the exercise of personal jurisdiction must also comport with "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation omitted); *Moki Mac*, 221 S.W.3d at 575.

None of VMC's claims—which, for the purposes of jurisdictional analysis can be grouped into pre-transaction claims (fraud and securities fraud) and post-transaction claims (tortious interference, conversion, and money had and

---

466 U.S. 408, 413-14 (1984); *PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 166 & n.3 (Tex. 2007). VMC did not argue that Texas has general jurisdiction over Enright. Even if they had, Enright has not "conducted substantial activities within the forum" that were "continuous and systematic" to support general jurisdiction. *BMC Software*, 83 S.W.3d at 797. Moreover, it is not established that an individual can ever be subject to general jurisdiction in any state other than his domicile. *See Daimler AG v. Bauman*, 134 S. Ct. 746, 760 (2014). Finally, because the fiduciary shield doctrine renders any contacts with Texas by Enright in his capacity as an agent for his employer irrelevant for general jurisdiction, *Wolf v. Summers-Wood, L.P.*, 214 S.W.3d 783, 790 (Tex. App.—Dallas 2007, no pet.), none of Enright's contacts with Texas could satisfy general jurisdiction.

received)[8]—satisfy due process. First, VMC's pre-transaction claims fail to satisfy the minimum contacts requirement. Second, none of VMC's claims (pre- or post-transaction) arise from or relate to the contacts that Enright does have with Texas. And third, the exercise of personal jurisdiction over Enright for any of VMC's claims would offend the traditional notions of fair play and substantial justice.[9]

---

[8] For specific jurisdiction, jurisdictional contacts should be analyzed on a per-claim basis, unless the claims relate to the same underlying contacts. *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013). Because VMC's claims for fraud and securities fraud allegedly arise from the same contacts *before* the transaction, it is proper to analyze them together. Similarly, because VMC's other claims relate to Enright's alleged control over QVL's credit facility *after* the transaction, the jurisdictional analysis for each post-transaction claim is the same.

[9] As an initial matter, none of Mr. Enright's contacts with Texas were made in his capacity as an individual, and therefore they should not be attributed to him for jurisdictional purposes. Where an individual's contacts with Texas are attributable to his employer, the fiduciary shield doctrine precludes those contacts from supporting a claim of specific jurisdiction against the individual as well as general jurisdiction. *Stull v. LaPlant*, 411 S.W.3d 129, 138 (Tex. App.—Dallas 2013, no pet.). VMC have argued that because their claims against Enright are in his individual capacity, the fiduciary shield doctrine does not apply. However, this misstates the law in Texas. While some courts have stated in dicta that the fiduciary shield does not apply to specific jurisdiction, the Texas Supreme Court has never so held. Furthermore, several courts have recognized that official corporate acts should not be attributed to the individual for jurisdictional purposes unless the individual had an independent reason to perform those acts. *See Kaye/Bassman Int'l Corp. v. Dhanuka*, 418 S.W.3d 352, 359 (Tex. App.—Dallas 2013, no pet.) ("Absent pleading and proof that an officer's conduct was solely for the officer's benefit and contrary to the interest of the business entity, an officer's 'acts on the corporation's behalf are deemed corporate acts.'") (quoting *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 432 (Tex. 1997)). In this case, there is no evidence that Enright had any contact with Texas for any purpose other than in the sole interest of White Winston. Enright has no personal interest in any of the entities involved in the transaction, including White Winston, or in the transaction or any of the agreements. Therefore, he does not have the minimum contacts necessary to justify the assertion of personal jurisdiction.

14

**A.** **While representing White Winston in negotiating and providing the purchase loan to VMC, Enright did not purposely avail himself of the privileges of conducting business within Texas, so as to invoke the benefits and protections of Texas law.**

Enright's contacts with Texas prior to VMC's purchase of QVL's pharmacies do not constitute the "purposeful availment" required for minimum contacts. There are three key elements to purposeful availment. First, only the defendant's contacts with the forum are relevant to purposeful availment. *Moki Mac*, 221 S.W.3d at 575. Second, Enright's contacts must be "purposeful rather than random, fortuitous, or attenuated" *Id.* Third, he "must seek some benefit, advantage or profit by availing [him]self of the jurisdiction." *Id.* (quotation marks and citation omitted). Enright's pre-transaction Texas contacts meet none of these requirements.

First, the contacts relied on by the trial court are not Enright's. It is not sufficient that VMC or QVL were located in Texas or that VMC's alleged injury was felt in Texas. *See Revell v. Lidov*, 317 F.3d 467, 473 (5th Cir. 2002) ("[T]he plaintiff's residence in the forum, and suffering of harm there, will not alone support jurisdiction."); *see also Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 870 (5th Cir. 2001). "[O]nly the defendant's contacts" are relevant to personal jurisdiction, *Moki Mac*, 221 S.W.3d at 575. Here, it is undisputed that Enright did not reach out to Texas. Instead, Enright's contacts

15

were the result of the "unilateral activity of another party or a third person." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).

The record shows, and VMC do not dispute, that Enright, on behalf of White Winston, came into contact with VMC only because Dr. Franklin expressed an interest in discussing financing possibilities with White Winston after Mr. Collins contacted him on behalf of QVL. Without Dr. Franklin's interest and Mr. Collin's invitation, Enright would never have had the two calls with Dr. Franklin or executed the loan agreements between VMC and White Winston. *See TeleVentures, Inc. v. Int'l Game Tech.*, 12 S.W.3d 900, 912 (Tex. App.—Austin 2000, pet. denied) (holding contacts "instigated" by the plaintiff did not constitute purposeful availment by the defendant); *see also Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 793-94 (Tex. 2005) (holding that the defendant, based in Michigan, did not purposefully avail itself of the benefits of doing business in Texas by selling an RV to a Texas resident who had initiated the transaction).

Even assuming that these contacts could be considered Enright's rather than VMC's, they still fail to meet the second requirement for purposeful availment– that his contacts were purposeful. Enright did not "reach out beyond" his home state of New Hampshire to "create continuing relationships and obligations" in

16

Texas. *Michiana*, 168 S.W.3d at 785. To the contrary, Enright received and responded to VMC's inquiry concerning financing.

This case is similar to *Michiana*, in which the Texas Supreme Court held that Texas could not exercise personal jurisdiction over an Indiana-based merchant who sold and shipped a recreational vehicle to the plaintiff in Texas. *Id.* at 781. In that case, the sale was instigated by the plaintiff, who first called the defendant. *Id.* The defendant's only contacts with Texas came as a result of that call, and therefore did not constitute purposeful availment. *Id.* at 794. Just like the defendant in *Michiana*, Enright did not purposefully reach out to Texas by answering QVL's and VMC's request to discuss financing.

In fact, Enright's pre-transaction contacts with Texas are even more attenuated than the contacts in *Michiana* because, unlike the defendant in *Michiana*, Enright, as an individual, was not a party to the resulting transaction. The plaintiff in *Michiana* sued the company from whom he purchased an RV, whereas here, VMC have sued one of White Winston's agents as an individual. Enright's two telephone calls and handful of emails with VMC in December 2013 depended first on Mr. Collins' and Dr. Franklin's decision to reach out to White Winston and second on the fact that Enright is White Winston's agent. Enright's connection in his individual capacity to these contacts is far too attenuated to be considered purposeful.

17

Finally, the third requirement of purposeful availment—that Enright sought some benefit or advantage of doing business in Texas—is not met by his pre-transaction contacts. *See Moki Mac*, 221 S.W.3d at 575. It is undisputed that Enright personally has no interest in QVL, VMC, White Winston, or any agreement or transaction among them. Enright individually never did any business in Texas of any kind. The only business conducted by Enright was White Winston's loan to VMC, and that transaction was explicitly structured so as to disclaim any "benefit, advantage or profit" from Texas by establishing Massachusetts as the forum with exclusive jurisdiction over potential disputes. As evidenced by the forum selection clauses of those documents, Enright, representing White Winston, plainly sought no benefit of doing business in Texas. *See Moki Mac*, 221 S.W.3d at 575; *see also Michiana*, 168 S.W.3d at 792 ("[I]nsertion of a clause designating a foreign forum suggests that no local availment was intended.").

None of the three elements of purposeful availment are present with respect to VMC's pre-transaction claims. For Texas to exercise specific jurisdiction over Enright, due process requires that he personally and purposefully availed himself of the benefits of doing business in Texas, and he did not do so.

18

**B.** **The exercise of specific jurisdiction over Enright is improper because his contacts with Texas have no substantial connection to the alleged torts.**

The trial court's order is flawed for the independent reason that none of VMC's claims—pre- or post-transaction—are sufficiently related Enright's contacts with Texas. In addition to purposeful availment, due process also requires that "the defendant's alleged liability 'aris[es] out of or [is] related to' an activity conducted within the forum." *Moki Mac*, 221 S.W.3d at 576 (citation omitted). "The 'arise from or relate to' requirement lies at the heart of specific jurisdiction by defining the required nexus between the nonresident defendant, the litigation, and the forum." *Id.* at 579. Specific jurisdiction is improper unless there is "a substantial connection between [the defendant's] contacts and the operative facts of the litigation." *Id.* at 585. In this case, Enright's contacts with Texas are unrelated to the alleged conduct underlying VMC's post-transaction claims and in any event, all of VMC's claims fail as a matter of law and therefore cannot arise from or relate to any contacts with Texas.

**1.** **The factual basis for VMC's post-transaction claims is unrelated to Enright's contacts with Texas.**

The facts underlying VMC's post-transaction claims—that White Winston prevented QVL from making payments to VMC—are not substantially related to any contacts with Texas. VMC assert that White Winston failed to advance credit to QVL to make its payments, causing QVL to breach the TSA. However, White

19

Winston's administration of QVL's credit facility entailed no connection with Texas at all. Thus, the conduct underlying VMC's claims that Enright tortiously interfered with QVL's payments under the TSA or that he converted VMC's property did not involve any contacts with Texas. Put another way, Enright's actual contacts with Texas on behalf of White Winston—business communications with QVL and VMC and a handful of trips—are not substantially connected to the alleged torts.

Even accepting all of VMC's allegations regarding Enright as true, all of Enright's conduct took place, if at all, outside of Texas. White Winston's advances of credit to QVL took place entirely outside of the state of Texas, and the requested credit was made available to QVL through a zero-balance checking account located in Boston. In August of 2014, a contractor for QVL mistakenly sent VMC a check although QVL had no credit available, and the Boston-based bank automatically rejected the check. Even if Enright were personally responsible for that conduct and even if the conduct were somehow tortious, it still did not involve any contacts with Texas and therefore fails to satisfy the "substantial connection" requirement. *See Moki Mac*, 221 S.W.3d at 585 (holding that plaintiff's personal injury claim concerned alleged negligence that took place in Arizona and the defendant's contacts with Texas—which consisted of

20

advertising and promoting to Texas residents its Arizona river-rafting trips—were not sufficiently connected to the claim to support specific jurisdiction).

Texas cannot exercise jurisdiction over Enright for the post-transaction claims because he had no contacts with Texas in relation to the allegedly tortious conduct. VMC's allegations that tortious effects were felt in Texas are wholly irrelevant to the question of personal jurisdiction. *See Moki Mac*, 221 S.W.3d at 575. Whatever the effects in Texas, White Winston's decisions and actions with respect to QVL's line of credit are not related to any contact with Texas by Enright.

In their pleadings and at the special appearance hearing, VMC repeatedly emphasize the number and frequency of Enright's communications with VMC and QVL. CR380; CR382-84; 2RR41, 2RR50-51. However, Enright's communications with parties in Texas do not substantially relate to the substance of VMC claims, which took place entirely outside of Texas. This Court has recognized the significant difference between communications that concern or discuss allegedly tortious conduct and communications that are substantially connected to the tortious conduct—the former cannot support personal jurisdiction, only the latter. *See TeleVentures*, 12 S.W.3d at 910 (concluding that defendant's letter to plaintiff in Texas terminating their agreement was not related to the claim for breach of contract because "[t]he breach, if any, was not created by the

21

termination letter; rather, if there was a breach, it occurred when and where [the defendant] ceased its performance of the contract").

These facts are similar to *TeleVentures*, in which this Court held that there was no personal jurisdiction over a Nevada-based company for claims for breach of contract, fraud, and tortious interference brought by a Texas-based manufacturer of hotel-gambling technology. *Id.* at 904. The plaintiffs in that case alleged that the defendant's letter terminating their contract and the subsequent establishment of a Texas-based joint venture with another company constituted sufficient contacts with Texas to confer specific jurisdiction. *Id.* This Court disagreed, and held that because the allegedly tortious conduct occurred in Nevada, the plaintiffs' claims were not substantially related to activity conducted within the forum. *Id.* at 910; *see also Briggs v. Seacoast Power, L.L.C.*, No. 03-01-00286-CV, 2001 WL 1346137, at *4 (Tex. App.—Austin Oct. 25, 2001, no pet.) ("neither contracting with a Texas resident nor communicating with such resident during the performance of this contract is sufficient to confer jurisdiction.").

Similarly here, Enright's communications with VMC and QVL in Texas are unrelated to the tortious conduct, which involved White Winston's decision whether to extend additional credit to QVL in Boston, with a Boston bank. That conduct, whatever its effects in Texas, is not related, let alone substantially related, to any contact with Texas by Enright.

22

**2.    *Because all of VMC's claims fail as a matter of law, Enright's contacts with Texas cannot possibly be "substantially connected" to any tortious conduct.***

Personal jurisdiction over all of VMC's claims—both pre- and post-transaction—does not satisfy the "substantially connected" requirement for the independent reason that VMC's claims fail as a matter of law.  Although, under Texas law, evidence that a defendant's conduct was tortious is not *sufficient* to confer personal jurisdiction, tortious conduct is nevertheless a *necessary* requirement for specific jurisdiction based on a tort.  Because Enright engaged in no tortious conduct, his contacts with Texas, no matter how extensive, cannot be substantially connected to any tortious conduct.

To confer personal jurisdiction based on commission of a tort, the Texas long-arm statute requires both the commission of a tort *and* that the commission of the tort took place in Texas.  Tex. Civ. Prac. & Rem. Code Ann. § 17.042(2). Because specific jurisdiction is predicated on the substantial connection between the defendant's contacts with Texas and the alleged tort, it is axiomatic that, without any tortious conduct, there can be no substantial connection.  Thus, a nonresident can defeat personal jurisdiction by showing either that the tort did not involve contacts with Texas *or* that his conduct, wherever committed, was not tortious.  *See Michiana*, 168 S.W.3d at 790-92 & nn. 76, 82 (disapproving of cases holding that "specific jurisdiction *turns on* whether a defendant's contacts were

23

tortious rather than the contacts themselves" but also recognizing that "a nonresident may defeat jurisdiction by proving there was no tort") (emphasis added). *Cf. Nat'l Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 774 (Tex. 1995) (finding no personal jurisdiction with respect to claims stemming from constitutionally protected conduct for which there could be no liability).

VMC's pre-transaction claims fail as a matter of law for two reasons. First, VMC's pre-transaction claims fail as a matter of law because, as set forth below in Part II, there is no evidence of fraud. VMC have not alleged, let alone produced any evidence, that Enright made any misrepresentation in the few contacts he had with VMC prior to the transaction. Without evidence of misrepresentation, there can be no connection between Enright's contacts and fraud. *See TeleVentures*, 12 S.W.3d at 911-12 (holding that there was no personal jurisdiction over defendant for claims of fraud where the communications at issue contained no actionable statements). Second, VMC's pre-transaction claims fail as a matter of law because VMC released Enright, as an agent of White Winston, from any and all claims existing on or before January 31, 2014, a fact VMC do not dispute.[10] Without a

---

[10] At the special appearance hearing, VMC argued that an affirmative defense cannot be considered at the jurisdictional phase, but cited no law in support. To the extent the trial court accepted this argument, it was in error. Even if VMC were correct that the trial court should not make a factual determination concerning a *disputed* question of release, VMC never even argued that the release was invalid or unenforceable, let alone offered evidence in support of such an argument. The trial court was not free to disregard the

viable fraud claim, there can be no "substantial connection" to support personal jurisdiction.

VMC's post-transaction claims similarly fail as a matter of law, because Enright's conduct could not possibly have caused the damages VMC allege. VMC claims that Enright's interference with the TSA caused VMC to breach their Loan Agreement with White Winston, which resulted in the loss of a $50,000 cutback credit. CR544 (¶ 39). However, the uncontroverted evidence—*i.e.*, the plain text of the Loan Agreement and the uncontroverted timing of VMC's final payment— shows that VMC were not due the credit because they had not paid off the loan within the timeframe required. CR237 (§ 1.3); CR209 (¶ 5). Thus, even if Enright's alleged interference with QVL's payment occurred—and even if it somehow related to a contact with Texas—the interference is still unrelated to VMC's claims because it cannot have been the cause of VMC's damages. *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207 (Tex. 2002) (stating that a claim for tortious interference with an existing contract requires that the plaintiff suffered actual damage or loss that was proximately caused by the alleged interference).

In short, because all of VMC's pre- and post- transaction claims fail as a matter of law, it is impossible for Enright's contacts with Texas to be

uncontroverted evidence that VMC had waived their fraud claim months before filing suit, leaving them without a claim on which to base specific jurisdiction over Enright.

25

"substantially connected" to any tortious conduct, as required by due process for the exercise of specific jurisdiction. The trial court erred in concluding otherwise.

### C. Exercise of personal jurisdiction over Enright does not comport with traditional notions of fair play and substantial justice.

Even if the purposeful availment and substantial connection tests were met, the trial court also erred in concluding that the exercise of personal jurisdiction for any of VMC's claims satisfies the traditional notions of fair play and substantial justice, an independent requirement for due process. *Guardian Royal Exch.*, 815 S.W.2d 223 at 231. Those concerns are strongly implicated in the case where, as here, VMC are attempting to avoid mandatory jurisdiction in another state.[11]

Fair play and substantial justice are not served by permitting VMC to sue White Winston's agent in his individual capacity in Texas. Enright, on behalf of White Winston, negotiated and executed the Loan Agreement and related documents with VMC, all of which are subject to Massachusetts law and exclusive

---

[11] In general, courts should consider the following factors in deciding whether the exercise of jurisdiction comports with traditional notions of fair play and substantial justice:

> (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute (including the state's special regulatory interest in areas such as insurance); (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies.

*Guardian Royal Exch.*, 815 S.W.2d at 231.

26

jurisdiction in the state of Massachusetts. White Winston's contracts with VMC are explicitly and purposefully structured to establish Massachusetts as the seat of the parties' relationship, and the same is true for White Winston's relationship with QVL.

Instead of suing White Winston in Massachusetts, VMC have transformed contract claims into tort claims and asked a Texas court to force Enright—who has no personal connection to Texas at all—to bear the burden and cost of cross-country litigation so that VMC can avoid the half-dozen documents it signed agreeing to submit to the jurisdiction of Massachusetts. Such an attempt to avoid mandatory jurisdiction in another state offends the notions of fair play and substantial justice. *See Ashdon, Inc. v. Gary Brown & Assocs., Inc.*, 260 S.W.3d 101, 118 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (holding that personal jurisdiction over a Florida-based sales representative would offend traditional notions of fair play and substantial justice where the representative conducted all of his business in Florida, the alleged conversion of property took place in Florida, and a related breach-of-contract claim was subject to litigation in Florida).

## II.    The trial court's order is not supported by the evidence in the record

In addition to misapplication of the law, the trial court's order is incorrect because it implicitly rests on findings of fact unsupported by the evidence. Although, as set forth in Part I, denial of Enright's special appearance was error

27

even assuming that Enright had the contacts with Texas alleged, the court also erred in concluding that there was sufficient evidence of those contacts. Because the evidence is both legally and factually insufficient to support the necessary factual findings underlying the denial, this Court should reverse the trial court's order and grant Enright's special appearance.

**A. The evidence is legally and factually insufficient to support the inference that Enright could have made any alleged misrepresentation to VMC prior to the transaction.**

With respect to VMC's pre-transaction fraud claims, the record contains no evidence that Enright made any misrepresentations to VMC in December of 2013. It is undisputed that VMC's contacts with Enright before the close of the transaction were limited to two telephone calls and one email exchange between December 12 and December 31, 2013.[12] There is no documentary evidence that Enright made any fraudulent misrepresentation related to any of those contacts, and Enright and Mr. Collins both testified that Mr. Collins negotiated the terms of sale with Dr. Franklin.

Dr. Franklin's affidavit is not, alone, sufficient to constitute evidence of a misrepresentation. Dr. Franklin claims that he had substantive discussions with Enright concerning the terms of the transaction, but even if this were true, his

---

[12] Dr. Franklin testified that he had the December 12, 2013 call with Enright and Mr. Collins and "at least one other phone call." CR437-38 (¶¶ 3, 5). Dr. Franklin never substantiates his implication that there were additional phone calls with any evidence.

28

vague descriptions of the content of those calls contain no description of any misrepresentation. Dr. Franklin claims that Enright discussed the terms of sale such as the price and the makeup of QVL's assets, but he does not identify a single statement by Enright that he claims was a misrepresentation.[13] In fact, VMC's Petition contains no allegation of any contact with Texas in which Enright made any specific misrepresentation.

Outside of Dr. Franklin's affidavit, there is only one email in the record between Dr. Franklin and Enright from December 13, 2013, which also does not contain evidence of a misrepresentation. CR466. It is a request by Enright for Dr. Franklin to provide financial information necessary to secure the purchase loan. It contains none of the substantive discussion Dr. Franklin alleges and contains no statement that the trial court could have inferred was a material misrepresentation. CR466. Thus, there is no evidence to support a necessary fact, and therefore the trial court erred in impliedly finding that fact without legally sufficient evidence.

In the alternative, the great weight and preponderance of the evidence is against the trial court's implied finding of fact. Dr. Franklin's conclusory testimony is contradicted by the testimony of Enright and of Mr. Collins. Beyond the conference call initiated by Mr. Collins on Dr. Franklin's behalf, the record

---

[13] Nor does Dr. Franklin ever explain how he came to rely on any of Enright's alleged statements.

contains no evidence of any communications between Enright and Dr. Franklin regarding the terms or conditions of the transaction, let alone evidence of any misrepresentation. VMC were unable to produce a single email, calendar invitation, telephone record, or any other document that refers even obliquely to the discussions that Dr. Franklin claims occurred. To find that Dr. Franklin was credible and Enright could have made alleged misrepresentations, the trial court would have had to believe that Dr. Franklin negotiated the purchase of two pharmacy locations for $675,000 in the space of two telephone calls with Enright lasting only a few hours. That finding is simply not supported by the weight of the evidence.

**B.** **The evidence is legally and factually insufficient to support the inference that Enright could have interfered with the TSA.**

There is also insufficient evidence to support the court's implied finding that Enright could have been responsible for the alleged interference with the TSA. Even assuming that White Winston's decisions concerning QVL's credit facility, all of which took place outside of Texas, could satisfy the due process requirements for specific jurisdiction, there is legally and factually insufficient evidence that Enright *personally* engaged in the alleged conduct. Although VMC claim that Enright personally stopped QVL's payment, the uncontroverted evidence is that QVL did not have any credit available when the check was

presented and that the stop payment was an automatic action taken by Boston Private Bank rather than by Enright.

Moreover, Enright had no power as an individual to extend or withhold credit from QVL. QVL's ability to pay any debt through its line of credit, including payments to VMC, depended on at least two factors: (1) the availability of credit and (2) the approval of White Winston to advance that credit. Enright did not have control over either factor. CR210 (¶ 6). The availability of credit depended on QVL's cash flow, and the decision to advance credit required the approval of two people at White Winston. Therefore, even if White Winston somehow tortiously prevented QVL from paying VMC, and even if that conduct were somehow substantially connected to some contact with Texas, there is *no evidence* that Enright was personally responsible for that conduct and, in fact, the uncontroverted evidence conclusively demonstrates that he was not personally responsible.

On behalf of White Winston, Enright communicated with QVL concerning the availability of credit and received QVL's requests for advances, but there is no evidence that Enright engaged in any of the allegedly tortious conduct (*i.e.*, that Enright personally prevented QVL from making any payment), and therefore the evidence is legally insufficient. In the alternative, even if VMC's conclusory assertions that Enright interfered could be considered "more than a mere scintilla"

of evidence, the great weight of the actual evidence is contrary to the trail court's implied finding, and therefore the evidence is factually insufficient.

Thus, the evidence before the trial court in deciding Enright's special appearance is factually and legally insufficient to support any inference by the trial court that Enright could have made a material misrepresentation or could have been responsible for Appellees' alleged harm. Without these implied findings of fact that Enright personally took some action in Texas relating to VMC's claims, the trial court's denial of Enright's special appearance is not justified.

## CONCLUSION AND PRAYER

Enright respectfully prays that, after full briefing and final hearing, this Court:

1.  Reverse the district court and grant Enright's special appearance;

2.  Dismiss VMC's claims against Enright for lack of personal jurisdiction;

3.  Award Enright the costs of this action; and

4.  Grant such other and additional relief to which Enright has shown himself to be justly entitled, whether at law or in equity.

Respectfully submitted,

VINSON & ELKINS LLP

*/s/ Jennifer B. Poppe*
Thomas S. Leatherbury
State Bar No. 12095275
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201
Telephone:  (214) 220-7700
Facsimile:  (214) 999-7792
tleatherbury@velaw.com

Jennifer B. Poppe
State Bar No. 24007855
Jonah Jackson
State Bar No. 24071450
2801 Via Fortuna, Suite 100
Austin, Texas 78746
Telephone:  (512) 542-8400
Facsimile:  (512) 542-8612
jpoppe@velaw.com
jjackson@velaw.com

**Attorneys for Appellant Todd Enright**

## CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(3), I hereby certify that this brief contains 7,690 words, excluding the words not included in the word count pursuant to Texas Rule of Appellate Procedure 9.4(i)(1). This is a computer generated document created in Microsoft Word, using 14-point typeface for all text, except footnotes which are in 13-point typeface. In making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document.

*/s/ Jennifer B. Poppe*
Jennifer B. Poppe

**CERTIFICATE OF SERVICE**

The undersigned certifies that on the 21st day of July 2015, a true and correct copy of this brief was served on the following attorneys in accordance with the requirements of the Texas Rules of Appellate Procedure via electronic filing or email.

Eric J. Taube
Paul Matula
Taube Summers Harrison Taylor Meinzer Brown, LLP
100 Congress Avenue, 18th Floor
Austin, Texas  78701
etaube@taubesummers.com
pmatula@taubesummers.com

/s/ Jennifer B. Poppe
Jennifer B. Poppe

US 3623643

# **APPENDIX**

Appendix-1    Order Denying Defendant Todd Enright's First    CR567-68
Amended Special Appearance (May 15, 2015)

36

# Appendix-1



Filed in The District Court of Travis County, Texas

At _____3:06_____

MAY 15 2015

Velva L. Price, District Clerk _____ P.M.

CAUSE NO. D-1-GN-14-004689

| | | |
|---|---|---|
| ASCLEPIUS PANACEA, LLC, ASCLEPIUS PANACEA GP, LLC, DAILY PHARMACY, LLC, DAILY PHARMACY GP, LLC, AND TOTH ENTERPRISES II, P.A. D/B/A VICTORY MEDICAL CENTER | § § § § § | IN THE DISTRICT COURT |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| QVL PHARMACY #181 GP, LLC, QVL PHARMACY # 162 GP, LLC, QVL PHARMACY HOLDINGS, INC., and TODD ENRIGHT, INDIVIDUALLY | § § § § | 98ᵀᴴ JUDICIAL DISTRICT |
| | § | |
| Defendants | § | |

## ORDER DENYING DEFENDANT TODD ENRIGHT'S FIRST AMENDED SPECIAL APPEARANCE

On this day came to be considered Defendant Todd Enright's First Amended Special Appearance. Having considered the special appearance, the response filed by the Plaintiffs, the arguments of counsel presented at the hearing on April 30, 2015 and the evidence admitted, and the pleadings, the Court is of the opinion that the special appearance should be denied. It is therefore

ORDERED that Defendant Todd Enright's First Amended Special Appearance is DENIED.

SIGNED on this __15th__ day of ___May___, 2015.

_____
JUDGE PRESIDING

004029220



**AGREED AS TO FORM:**

Paul Matula
Taube Summers Harrison Taylor Meinzer Brown LLP
100 Congress Ave., Suite 1800
Austin, Texas 78701
Telephone: 512/472-5997
Telecopier: 512/472-5248
pmatula@taubesummers.com

COUNSEL FOR PLAINTIFF

Jennifer B. Poppe
Jonah Jackson
Vinson & Elkins, LLP
2801 Via Fortuna, Suite 100
Austin, Texas 78746-7588
Telephone: 512/542-8464
Telecopier: 512/236-3470
jpoppe@velaw.com
jjackson@velaw.com

COUNSEL FOR DEFENDANT TODD ENRIGHT

568